## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

---

|  |  |
|---|---|
| **CENTRO TEPEYAC,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **V.** | ) |
| | ) |
| **MONTGOMERY COUNTY,** | ) |
| | ) |
| **MONTGOMERY COUNTY COUNCIL IN** | ) |
| **ITS CAPACITY AS THE MONTGOMERY** | ) |
| **COUNTY BOARD OF HEALTH,** | ) |
| | ) |
| **MONTGOMERY COUNTY DEPT.** | ) |
| **OF HEALTH AND HUMAN SERVICES,** | ) |
| | ) |
| **AND MARC HANSEN, ACTING** | ) |
| **COUNTY COUNSEL,** | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

---

### PLAINTIFF'S (1) REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, AND
### (2) OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT

This case concerns an attempt by the Defendants to create special speech rules that apply only to speakers who talk about one particular subject: pregnancy. The law does not apply to *all* speakers who talk about pregnancy. Rather, it focuses on select speakers who wish to "provide information about pregnancy-related services" without employing a medical professional.

The Defendants' Brief candidly admits that the challenged speech rules are designed to target particular statements about abortion with which the government disagrees. In particular, Defendants admit that the regulation "was borne of the Council's concern about the accuracy and

1

truthfulness of information being provided to pregnant women at pregnancy resource centers . . .

including claims that, contrary to the medical data, abortion increases the risk of breast cancer."

(Defendants' Brief at 3, 4).  Defendants' Brief recognizes that not *all* unlicensed speakers about

pregnancy are regulated—and in particular that unlicensed speakers may counsel at abortion

clinics without informing women of their lack of qualifications—but explains that it cannot

regulate unlicensed counselors at abortion clinics because it "cannot guarantee that every woman

will always have access to a licensed medical professional," and that, in any case, it is free to

regulate abortion-related speech "piecemeal."  *Id.* at 15, 17.

Defendants suggest that this type of viewpoint- and content-based targeting is permissible

because either (1) the Council has deemed the speech to be "fraudulent speech," (*id.* at 8) (2) the

speech arises "in the abortion context" and is therefore subject to "informed consent"

requirements imposed on doctors who perform abortions (*id.* at 8-9), or (3) the speech is

"commercial speech" (*id.* at 9).  All of these arguments fail.

First, Defendants' admission that they enacted the law to target speech about abortion

with which the Council disagreed is fatal.  Simply put, the government has now admitted that its

law is *designed* to undermine speech from a particular viewpoint with which it apparently

disagrees.  *Id.* at 3, 4.  Such action is flatly prohibited, as the government "must abstain" from

regulating speech where, as the government here admits, "the opinion or perspective of the

speaker is the rationale for the restriction."  *Rosenberger*, 515 U.S. at 828-29.  Indeed, the

Supreme Court has repeatedly explained that the "principal inquiry" in its neutrality analysis is

whether the government has done exactly what Montgomery County has now admitted, namely

regulated speech "because of disagreement with the message it conveys."  *Ward,* 491 U.S. at

791.  For this reason alone, the Resolution is invalid as a matter of law, and the Court should

enter a preliminary injunction and deny Defendants' motion.

Second, Defendants' attempt to regulate pro-life speech simply because it concerns abortion likewise fails. The two cases upon which Defendants rely to justify abortion-specific speech rules—*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) and *Planned Parenthood of Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008)—address the standard that states may apply when regulating the requirements of informed consent before a physician *performs* an abortion as part of the regulated practice of medicine. While it is unsurprising that courts have upheld regulations governing the conduct of individuals who need a license from the state to practice medicine, and relating to the requirements of informed consent for surgery, no similar requirements can be imposed just because speakers want to provide material support to pregnant women, discuss the social services and other support that is available to them and otherwise *talk about* their options, including abortion. The government can of course require a license and informed consent to *perform* abortions (or any other practice of medicine); but it cannot require these hurdles simply to *talk about* anything related to pregnancy, including the wide variety of non-medical issues that a pregnancy may create. There is no abortion exception to the First Amendment. That Defendants even suggest special rules apply because of the subject matter of Plaintiff's speech confirms the law is content-based and invalid.

Third, Defendants' attempt to rely on commercial speech cases also fails. Plaintiff's speech is simply not commercial speech. The Supreme Court has unequivocally held that commercial speech analysis extends only to "expression solely related to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980). Plaintiff has *no* economic interest in providing the charitable

assistance it gives to the women it serves—it provides that assistance as a free service to women in need.  Accordingly, Centro Tepeyac's speech related to pregnancy and abortion—possibly the most controversial political, social, ethical, moral and religious issue of our time—is not commercial speech, but core protected First Amendment speech.

For these reasons, and as set forth more fully below, the Court should grant Plaintiff's request for a preliminary injunction and deny Defendants' motion to dismiss.

## I.     LEGAL STANDARDS

The legal standard applicable to Plaintiff's Motion for a Preliminary Injunction is set forth in Plaintiff's initial Memorandum at page 6.

As to Defendants' cross-motion to dismiss, a complaint should only be dismissed "if it does not allege 'enough facts to state a claim to relief that is plausible on its face.' " *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir.2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The facts alleged must be sufficient "to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.  The court must "assume that the allegations of the complaint are true and construe them in the light most favorable to the plaintiff." *Republican Party of North Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992).  When "a Rule 12(b)(6) motion is testing the sufficiency of a civil rights complaint, '[the Court] must be especially solicitous of the wrongs alleged' and 'must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) quoting *Harrison v. United States Postal Serv.*, 840 F.2d 1149, 1152 (4th Cir.1988) (internal quotation marks omitted).  To the extent Defendants' motion is converted to a motion for summary judgment, they can only prevail if

there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, a court "must believe the evidence of the non-movant, and all justifiable inferences must be drawn in the non-movant's favor."  *Estate of Kimmell Through Kimmell v. Seven Up Bottling Co. of Elkton, Inc.*, 993 F.2d 410, 412 (4th  Cir. 1993).

## II.    DEFENDANTS' BRIEF CONFIRMS THE RESOLUTION IS IMPERMISSIBLY CONTENT- AND VIEWPOINT-BASED.

### A.  The Law Impermissibly Targets Pro-Life Speakers Based On The Content And Viewpoint of Past Alleged Speech By Other Pro-Life Speakers.

Defendants argue that the "Resolution is not directed at speech or the content of speech." Def. Br. at 15-16.  Likewise, Defendants claim that the law's focus on pro-life pregnancy resource centers—and its total failure to provide similar protections for women counseled by unlicensed counselors at abortion clinics—"has nothing to do with the Council's, or anyone else's, view of abortion."  *Id.* at 14.  Defendants' admissions, both in their brief and throughout the legislative history, demonstrate that exactly the opposite is true.

First and foremost, Defendants' Brief *expressly admits* that the law is aimed at pregnancy center speech *because of the content of that speech*:  "As is reflected in the legislative record, the Resolution was borne of the Council's *concern about the accuracy and truthfulness of information* being provided to pregnant women at pregnancy resource centers."  Def. Br. at 3 (emphasis supplied).  The Brief goes on to argue that this concern is "well-founded" because both a minority staff report from a Congressional committee and allegations made by NARAL Pro-Choice Maryland suggest that pro-life pregnancy centers provided "false information related, *inter alia*, to the risks of abortion, including claims that, contrary to the medical data, abortion increases the risk of breast cancer."  *Id.* at 3-4.

5

As a matter of First Amendment law, these admissions are damning. The government is not permitted to enact speech regulations simply because it disagrees with the content or viewpoint taken by the speaker on a particular issue (here, the health risks of abortion).[1] To the contrary, the "principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, *is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.*" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (emphasis added). Here, Defendants have now admitted to adopting a regulation of speech "because of disagreement with the message it conveys" about the health risks of abortion. Indeed, they have admitted to regulating Centro Tepeyac's speech because of their disagreement with the alleged viewpoint of speech by *other* pregnancy centers in *other* places. As the Supreme Court has made clear, such regulations are impermissible: "The government *must abstain* from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (emphasis added). In light of this admission, the Resolution is invalid as a matter of law.[2]

_____

[1] Nor can the government regulate present and future speech based on past legal speech. *See, e.g., Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 310-11 (1980); *Ackerley Communications of Massachusetts, Inc. v. City of Somerville*, 878 F.2d 513, 520-21 (1st Cir. 1989).

[2] Nor can the government defend the law by claiming pro-life speech on these issues has been "false" in the past. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-341 (1974). Here, there is clearly competing medical evidence on the health effects of abortion, and the government has no power to declare one idea about that evidence "false" and therefore proscribable. *See, e.g.,* Dolle J, Daling J, White E, Brinton L, Doody D, et al. Risk factors for triple-negative breast cancer in women under the age of 45 years. Cancer Epidemiol Biomarkers Prev 2009;18(4)1157-1166 (listing abortion among "known and suspected risk factors" and showing a 40% increased risk for "triple negative" breast cancer); Peng Xing, et al.,

Second, Defendants argue that the law is not viewpoint based, even though it permits unlicensed counselors at abortion clinics to discuss pregnancy without advising women of their lack of credentials, and without informing them that the County thinks they should see a doctor. According to Defendants:

> The Resolution regulates based on whether there is a licensed medical professional on-site at an LSPRC, not on viewpoint.  In order to achieve viewpoint neutrality, under the Plaintiff's absurd reasoning, the Resolution would have to require that abortion clinics with licensed medical staff falsely advise women that they have no licensed medical staff.

Def. Br. at 15.  Of course the Plaintiff suggests no such absurdity—the government could have improved its regulation simply by requiring that patients counseled by unlicensed counselors at abortion clinics receive the same message required at pro-life centers.  Likewise, the government could have better achieved its purported interest by requiring that the licensed medical

---

A Case-control study of reproductive factors associated with subtypes of breast cancer in Northeast China, 26 MEDICAL ONCOLOGY 37 (2009) (abstract available at http://www.ncbi.nlm.nih.gov/pubmed/19771534) (noting "induced abortion increased the risk of breast cancer"); The Royal College of Psychiatrists, Position Statement on Women's Mental Health in Relation to Induced Abortion, Mar. 14, 2009, *available at* http://www.rcpsych.ac.uk/member/currentissues/mentalhealthandabortion.aspx ("The specific issue of whether or not induced abortion has harmful effects on women's mental health remains to be fully resolved. The current research evidence base is inconclusive – some studies indicate no evidence of harm, whilst other studies identify a range of mental disorders following abortion.");  P.S. Shah et al., *Induced termination of pregnancy and low birthweight and preterm birth: a systematic review and meta-analysis*, 116 BRIT. J. OBSTETRICS & GYNAECOLOGY 1425 (2009), *available at* http://www3.interscience.wiley.com/cgi-bin/fulltext/122591273/ PDFSTART (finding that abortion increased risks of preterm delivery and low birth weight in future pregnancies).  Indeed, several states affirmatively *require* discussion of this information as part of obtaining informed consent to perform an abortion.  *See, e.g.*, MINN. STAT. § 145.4242 (2009) (prohibiting abortions without informed consent and providing that such consent is only effective if the women is informed of  "the particular medical risks associated with the particular abortion procedure to be employed including, when medically accurate, the risks of infection, hemorrhage, breast cancer, danger to subsequent pregnancies, and infertility); TEX. HEALTH & SAFETY CODE § 171.012 (2009) (consent only valid if woman is told of "the possibility of increased risk of breast cancer following an induced abortion and the natural protective effect of a completed pregnancy in avoiding breast cancer").

professional not simply be "on staff" (which may consist of being available only if and when a patient has already decided to have an abortion) but rather involved in or supervising patient counseling.  Instead, the County leaves these exchanges entirely unregulated, focusing only on pro-life counseling.

The uncontested facts of the legislative history demonstrate that this differential targeting of pro-life speech is both deliberate and based solely on the viewpoint of pro-life speech.  First, as set forth above, Defendants have already admitted that the Resolution is, in fact, aimed at the content and viewpoint of speech—it is designed to counteract what the Council apparently believed was the "false" view of competing evidence about the health effects of abortion.[3]  Indeed, when considering the law, the Council admitted the law was "designed to address" such statements, and the Council issued a press release confirming that the law was "needed" because of speech by pregnancy centers that seek to "discourage women from seeking contraception or abortion."[4]

Defendants' request for content-neutral treatment asks this Court to assume that the Resolution somehow fails to target the speech content it was "designed" to target.  But this conclusion would fly in the face of the facts.  Rather, in light of the Council's repeatedly-admitted goal, the law's laser-like focus on pro-life pregnancy center speech—and its

---

[3] Montgomery County is of course free to form its own conclusions about the health risks, or lack thereof, of abortion.  And as a speaker, Montgomery County is free to convey whatever message it wishes to the public (though there is no hint in the record that it has *ever* done so by any mechanism other than commandeering the walls of pro-life facilities like the Plaintiff).  But when regulating the speech of its citizens, the County is not free to use its own views on these issues to declare opposing speech "false" and therefore subject to special restrictions.

[4] *See* Exhibit C to Preliminary Injunction Motion at 2; Exhibit D to Preliminary Injunction Motion at 3.

inapplicability to even unlicensed counseling at abortion clinics[5]—is best understood as the legislature's attempt to do exactly what it set out to do.  In fact, the very definition of "limited service pregnancy resource center" originally included *only pro-life speakers*, i.e., those that would "not provide or refer for . . . abortion."  This language was proposed by not one, but *six* of the seven members of the Council who ultimately voted for the Resolution in its final form, and it is powerful evidence that the targeting of pro-life speakers is deliberate, rather than accidental.[6]  Indeed, the very use of the term "pregnancy resource center" refers to pro-life facilities.[7]  The Resolution's final terminology—"limited service pregnancy resource center"—is defined in Baltimore to refer only to pro-life facilities.   *See* Baltimore City Ordinance 09-252.[8]

---

[5] This imbalance provides an additional basis for Plaintiff's Fourteenth Amendment claims under the Equal Protection Clause, *see, e.g., Police Dept. of Chicago v. Mosley,* 408 U.S. 92 (1972).

[6] Exhibit D to Preliminary Injunction Motion at circle-2 (showing original and edited text of law).  Plaintiff agrees with Defendant that it would be "absurd" to require facilities "with licensed medical staff [to] falsely advise women that they have no licensed medical staff."  The Defendants originally proposed precisely this type of "absurdity" in its original regulation of only pro-life speakers, requiring them to claim they had no licensed medical professionals on staff—simply because they opposed abortion.  *See id.*  The fact that the Council eventually decided to remove this admitted absurdity does not remove the taint from the law, particularly where Defendants still admit the law is designed to target content, and where Defendants have not pointed to any evidence in the legislative history to suggest that even a single pro-choice facility in the County qualifies for regulation.  The fact that the admitted "absurdity" was originally proposed by a majority of the Council confirms the Council's hostility to pro-life speakers on this issue, and eviscerates any claim that the disproportionate burden on them is incidental.

[7] *See* Exhibit D at circle-10 (Waxman minority staff report) ("'Pregnancy resource centers' are virtually always pro-life organizations").

[8] In litigation challenging Baltimore's law, the defendants voluntarily agreed not to enforce the speech regulation for the rest of 2010 in order to obtain additional time to answer the complaint.  *See Archbishop O'Brien v. Mayor and City Council of Baltimore*, Case No. 10-760-MJG, docket entry no. 9, Exhibit C.  Baltimore's willingness to give up 8 months of enforcement in order to obtain a few extra weeks to answer a complaint suggests it views its own interest as somewhat less than compelling and that the public interest is not harmed by suspending the law.

Furthermore, if the legislature was actually concerned with making sure that women knew whether they were discussing pregnancy with a licensed or unlicensed person, it could have simply regulated *all* such discussions. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 129 S. Ct. 1093, 1105 (2009) ("The statute's discriminatory purpose is further evidenced by its substantial . . . underinclusiveness with respect to the State's asserted interest in passing the legislation."). By leaving these discussions entirely unregulated when they occur at abortion clinics,[9] the County undermines that claimed interest.[10]

> B. The Resolution is Impermissibly Content-Based Because It Only Regulates Speakers Who Discuss Pregnancy.

Even without Defendants' admitted targeting of pro-life speakers because of the content and viewpoint of their speech, the Resolution is impermissibly content-based because it only applies to speakers who wish to "provide information about pregnancy-related services." If Plaintiff wished to provide charitable services to women relating to any other issue on earth— drug abuse, domestic violence, obesity, smoking—they would not be regulated. The Resolution is triggered entirely by the subject matter Plaintiff wishes to discuss and is therefore impermissibly content-based.

The Defendants' only attempt to answer this charge is to argue that the Resolution "is not directed at speech or the content of speech, but, rather, at LSPRC's that provide *pregnancy-*

---

[9] Deposition testimony of Planned Parenthood in other jurisdictions suggests that, in fact, women at Planned Parenthood facilities are routinely counseled by untrained and unlicensed volunteers, and do not see a doctor unless and until they have already chosen to have an abortion. *See Planned Parenthood v. Rounds,* United States District Court, District of South Dakota Civil Case No. 05-4077, Docket Entry 296 at 10-15 (Intervenors' Rule 56.1 statement of undisputed facts, citing Planned Parenthood deposition testimony about counselors and their training).

[10] As the Supreme Court has explained, such underinclusiveness can also represent an improper "governmental attempt to give one side of a debatable public question an advantage in expressing its views." *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994).

*related services*." Def. Br. at 15-16 (emphasis added). This argument only proves that the law is a speech regulation—the very *definition* in the law of providing "pregnancy-related services" is an individual or entity who wishes to "provide information about pregnancy-related services." Thus the law only applies to people who *talk* about pregnancy. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 643 (1994). As Defendants admit in their brief, such content-based laws are presumptively unconstitutional. Def. Br. at 7.

### III.   *CASEY* AND *ROUNDS* DO NOT AUTHORIZE BROAD SPEECH RESTRICTIONS ON ALL SPEAKERS WHO DISCUSS ABORTION.

The Defendants argue that the First Amendment protection against forced speech recognized by the Supreme Court in *Wooley v. Maynard* does not apply to speakers who talk about abortion. Instead, Defendants claim the decisions in *Casey* and *Rounds* authorize the government to require certain disclosures if and when speakers talk about abortions, even if they are not going to perform them. Def. Br. at 8-9, 16.

*Casey* and *Rounds* are inapplicable because they related to speech requirements imposed as part of the State's regulation of the licensed medical professionals seeking to obtain informed consent prior to performing surgery. In *Casey*, the Supreme Court held that "a requirement that a doctor give a woman certain information *as part of obtaining her consent to an abortion*" implicates a physician's First Amendment right not to speak, "*but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State*." *Casey*, 505 U.S. at 884 (emphasis added).

Likewise in *Rounds*, the Eighth Circuit addressed a South Dakota requirement that physicians provide certain information to patients as part of obtaining informed consent. Among

other things, the law required doctors to inform patients that "the abortion will terminate the life of a whole, separate, unique, living human being." *Rounds,* 530 F.3d at 735.  The Eighth Circuit permitted this requirement as part of the state's "regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion." *Id.*

These cases cannot be extended to all speakers who wish to "provide information about pregnancy-related services."  The physicians in *Casey* and *Rounds* needed a *license* from the State to practice medicine; the Plaintiffs need no license to simply *talk about* medicine.  Likewise, *Casey* and *Rounds* both related to State requirements for informed consent—without which any surgery would be a battery.  Here, the Plaintiff does not need informed consent simply to talk about and offer help related to pregnancy.  Thus while the government can regulate the speech of doctors seeking to perform medical services, it cannot use that power to regulate speakers who merely wish to assist pregnant women and discuss them as part of a broader discussion of their options.[11]

## IV.   PLAINTIFF'S SPEECH IS NOT COMMERCIAL SPEECH

Defendants suggest that this Court should apply tests related to commercial speech to Plaintiff's discussions concerning pregnancy.  *See* Def. Br. at 9.  This argument is flatly rejected

---

[11] Notably, although *Casey* and *Rounds* clearly permit some regulations concerning disclosures that should be made to women before they consent to an abortion, the Defendants have made no effort to regulate the speech of abortion providers—thus leaving the women they purport to protect vulnerable.  Nor have the Defendants attempted to have their regulation reach even unlicensed counselors who may counsel women considering their options at abortion clinics.  Whatever one's view of the South Dakota requirement at issue in *Rounds*, it is preposterous to suggest that the Eighth Circuit's decision would allow a state to require that disclosure of *all speakers* who talk about abortion, much less to all such speakers *except* speakers at facilities that actually provide abortions.

by controlling precedent.  As explained by the Supreme Court in *Central Hudson Gas & Elec. Corp v. Public Serv. Comm'n*, the ability to regulate commercial speech extends only to "expression solely related to the economic interests of the speaker and its audience."[12]  Here, Centro Tepeyac has no economic interest at all in providing free services to women in need.  Its speech is not commercial speech.

Even if Plaintiff's speech *were* commercial speech the Resolution would still fail even that more lenient review.  Regulations of commercial speech must still "directly advance[] the governmental interest asserted" and must not be "more extensive than is necessary to serve that interest."  *Central Hudson*, 447 U.S. at 566.  To pass the test, the government has the burden of demonstrating that the law advances the governmental interest "in a direct and material way." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (deeming this requirement "critical").

Here, the Resolution does *absolutely nothing* to outlaw the alleged false statements that Defendants suggest are proscribable and gave rise to the law.  Instead, the Resolution identifies a broad class of pro-life speakers, and imposes sign requirements designed to undermine their speech *regardless of the truth of their past or present speech.*  Thus the law neither directly advances a governmental interest in supposedly truthful speech about abortion, nor is it tailored to do anything of the sort.  Nor, of course, does it impose *any* requirement on speakers at

---

[12] Nor could Plaintiff's speech be characterized as commercial speech simply because the abortion transaction may be commercial for those who perform it.  As the Supreme Court has explained, commercial speech "cannot simply be speech on a commercial subject. No one would contend that our pharmacist may be prevented from being heard on the subject of whether, in general, pharmaceutical prices should be regulated, or their advertisement forbidden." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761-762 (1976).

abortion clinics to provide truthful information about abortion.[13]  As such, it is invalid even as a regulation of commercial speech.  *See Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995).

## V.    DEFENDANTS CANNOT CARRY THEIR BURDEN TO JUSTIFY THE SPEECH RESTRICTION.

When the Government restricts speech, it bears the burden of proving the constitutionality of its actions. *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816-817.  While Defendants rely on "commercial speech" cases to argue that the "quantum of evidence required to justify a speech restriction is not great," Def. Br. at 9[14], their burden is actually much greater.  The Supreme Court has been clear that "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994).  Rather, Defendants "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.*  The Defendants have not and cannot meet this burden.

---

[13] Surely the Council was aware that its approach does not address the alleged problem in a "direct and material way."  Indeed, the *Washington Post* editorialized at the time that the resolution "does not directly address" the alleged problem of false speech and noted that the "proposed disclosure is too cryptic to be an effective alarm bell for many women and yet is suspect because it singles out pregnancy centers while absolving abortion clinics of any disclosure requirements regarding adoption or parenting options." *See* "Pregnant and in Need of Help, Montgomery's Legislation on Disclosure is Flawed," *Washington Post*, November 23, 2009, available at http://www.washingtonpost.com/wpdyn/content/article/2009/11/22/AR2009112201605.html.

[14] Defendants rely for this standard on *Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995), which is clearly inapplicable. *See* Def. Br. at 9.  The Court in *Florida Bar*, however, was quite clear in stating that its analysis pertained to *commercial* speech by *licensed* speakers: "This case . . . concerns pure commercial advertising, for which we have always reserved a lesser degree of protection under the First Amendment. Particularly because the standards and conduct of state-licensed lawyers have traditionally been subject to extensive regulation by the States, it is all the more appropriate that we limit our scrutiny of state regulations to a level commensurate with the " 'subordinate position' " of commercial speech in the scale of First Amendment values." *Florida Bar*, 515 U.S. at 634-635.  This standard is entirely inapplicable here.

First, the vast majority of evidence upon which the Defendants rely relates to statements allegedly made by other unnamed speakers, in other contexts, outside of Montgomery County. Any reliance on such evidence to support a restriction of Plaintiff's speech presumes that the government can validly predict and regulate Plaintiff's speech because of how other speakers who oppose abortion spoke, in other locations, to other audiences. But the government cannot engage in this type of guilt-by-viewpoint-association to selectively restrict speech based on the behavior of other speakers with similar ideas. *Cf. Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 100-101 ("Predictions about imminent disruption from picketing involve judgments appropriately made on an individualized basis, not by means of broad classifications, especially those based on subject matter.").

Second, the Resolution does nothing to address the alleged problem of false statements concerning abortion. If addressing these allegedly proscribable false statements is a valid governmental interest, Defendants should attempt to regulate that problem directly, namely by outlawing it. Their failure to do so confirms that they either are not actually motivated by this interest, or they know the speech is not actually proscribable. In either case the interest is not sufficient to support the far broader speech regulation at issue here, which applies to *all* speech about pregnancy, regardless of its alleged truth or falsity.

Third, Defendants point to *no evidence* in the legislative record suggesting that even a single actual pregnant woman mistakenly believed Plaintiff—or anyone else regulated by the Resolution—was a medical facility. The best they can do is offer legislative testimony submitted by "volunteer interns" and "volunteer investigators" from NARAL Pro-Choice Maryland suggesting that other women "could be duped" into thinking some centers were medical providers. Def. Br. at 4. Yet the government's burden is to "demonstrate that the recited harms

15

are real, not merely conjectural," *Turner Broadcasting*, 512 U.S. at 624, and that burden cannot

possibly be carried by relying on such speculative testimony, particularly from obvious political

opponents of pro-life speakers.[15]   And such thin "evidence" surely cannot be sufficient to carry

Defendants to victory *as a matter of law*, without so much as an opportunity for Plaintiff to take

depositions of the "volunteer investigators" and those at NARAL who sent them, or to otherwise

test the government's allegedly valid interest.

Fourth, the Resolution is vastly over-inclusive in that it restricts speakers regardless of

the truth or falsity of their past speech.  Indeed the unifying factor for Montgomery County's

regulation of speakers is not the frequency with which they supposedly lie, but the frequency

with which they *talk about pregnancy.*  Worse, the Resolution regulates their speech regardless

of whether they are talking about medical aspects of abortion (the government's alleged concern)

or the wide variety of other issues pregnancy may raise, including financial, housing,

employment, religious, ethical, moral, familial, social, and other issues.  Likewise, the

Resolution is overbroad in that it regulates speech even by individuals, even though there was *no*

*legislative evidence* (not even politically-motivated hearsay evidence of the kind offered against

centers) suggesting that any woman "could be duped" into thinking every individual speaking to

---

[15] NARAL's volunteer investigators assert that there is no link between abortion and breast
cancer, and suggest there is no link between oral contraception and cancer.  As to the former, *see
supra note* 2 (highlighting some examples of medical literature suggesting an abortion-breast
cancer link).  As to the relationship between oral contraceptives and breast cancer, *see* National
Cancer Institute, Oral Contraceptives and Cancer Risk:  Questions and Answers, *available at*
http://www.cancer.gov/cancertopics/factsheet/Risk/oral-contraceptives/print?page=&keyword=
(acknowledging that "some studies show an increased risk of breast cancer in women taking oral
contraceptives" and noting a 2003 National Cancer Institute study in which the risk of breast
cancer "was highest for women who used [oral contraceptives] in the five years prior to
diagnosis, particularly in the younger group.").

her about pregnancy was a doctor.  The Resolution is thus not properly tailored to any asserted

government interest.

Fifth, the Resolution is vastly under-inclusive in that it does not regulate all discussions

of pregnancy by unlicensed speakers as discussed above.

## VI.    DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT SHOULD BE DENIED.

For the reasons set forth above, the Resolution is invalid as a matter of law.  Accordingly,

Defendants cannot possibly carry their heavy burden to obtain either a dismissal or summary

judgment.  The evidence in the public record—including the text of the law, the legislative

history, and now Defendants' Brief—already make clear that the law is content-based and cannot

possibly survive strict scrutiny.  To the extent there is any doubt, however, the law is clear that

the government has the burden of proving that its law is permitted by the First Amendment.

*United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816-817.  To date,

Defendants have offered no admissible evidence of any kind, and before any dismissal or entry

of summary judgment, the Defendant must present such evidence to the Court, and the Plaintiff

is entitled to discovery to explore the government's alleged justification, the origins of the

Resolution, and other facts related to the constitutionality of the law.[16]

---

[16]     Defendant mentions, but does not pursue, two additional arguments, one about service of
the Montgomery County Council and one about whether the Department of Health and Human
Services is a proper defendant. Def. Br. at 13-14.
        First, Defendant asserts that the County's Department of Health and Human Services
"cannot be sued." *Id.* at 13.  In support, Defendant cites to a state law case deeming certain arms
of government to be co-extensive with the state in a damages action.  Here, however, the Council
gave the Department enforcement powers under the Resolution.  Defendants offer no cases
suggesting that they may create entities of government, charge them with enforcing laws that
violate federal constitutional rights, and then exempt them from suits seeking injunctive relief for
those violations in federal court.
        Second, Defendants suggest that the Montgomery County Council "if it can be sued at
all" can only be served by serving its "presiding officer." *Id.* at 13.  But Defendants

## CONCLUSION AND REQUEST FOR HEARING

For the reasons set forth above, Plaintiff respectfully requests that the Court grant its motion for preliminary injunction and deny Defendants' motion to dismiss.  Plaintiff requests a hearing for presentation of oral argument on both motions.

Respectfully submitted,


/s/ John R. Garza, Bar #01921
John R. Garza, Bar #01921
Garza, Regan & Associates
17 West Jefferson St.
Rockville, MD 20850
(301) 340-8200

Robert Michael
Shadoan, Michael & Wells LLP
108 Park Avenue
Rockville, MD 20850
301-762-5150

---

simultaneously admit that the Council is an organ of the County government, *id.*, and Plaintiffs served the County Attorney, who is representing *all* Defendants in this action, *id.* at 1*,* and, on information and belief, generally acts as counsel to the Council).  That the Council purported to act as the County's Board of Health—i.e., as a *different* part of the same County's government—does not suddenly create different service requirements.  In any case, the County Attorney is now representing the Council, and has been served with the papers.  Finally, even if service were technically improper, dismissal is only appropriate 120 days after the complaint has been filed, *see* Fed. R. Civ. P. 4(m), and the Council has already appeared and sought both dismissal and summary judgment in this matter.  To the extent Defendants' brief is read to include a request for dismissal on these grounds, it should be rejected.  *See McCreary v. Vaughan-Bassett Furniture Co., Inc.*, 412 F.Supp.2d 535, 537 (M.D.N.C., 2005) ("Technical noncompliance with Rule 4 does not, however, always require dismissal. Courts have stated, for instance, that dismissal is not always mandated where the necessary parties have received actual notice of a suit and where they have not been prejudiced by the technical defect in service.").

Mark L. Rienzi, *pro hac vice*
Robert Destro\*
Columbus School of Law
Catholic University of America
3600 John McCormack Rd. NE
Washington, DC 20064
202-319-4970

**Of counsel**
Steven H. Aden, *pro hac vice*
Casey Mattox, *pro hac vice*
Matthew Bowman, *pro hac vice*
ALLIANCE DEFENSE FUND
801 G St., N.W., Suite 509
Washington, DC  20001
202-393-8690

*Attorneys for Plaintiff*

\**Pro hac vice* motions to be filed

### CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2010, I electronically filed the foregoing Plaintiff's (1) Reply Brief in Support of Plaintiff's Motion for Preliminary Injunction, and (2) Opposition to Defendant's Motion to Dismiss or, in the Alternative, Summary Judgment (with exhibits) to the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Montgomery County, Montgomery County Council,
Montgomery County Department of Health and Human Services,
and Marc Hansen, Acting County Attorney
Executive Office Building
101 Monroe Street, 3rd Floor
Rockville, Maryland 20850


Clifford L. Royalty, Chief
Division of Zoning, Land Use &
Economic Development
101 Monroe Street, 3rd Floor
Rockville, Maryland 20850


　　　　　　　　　　　　　 /s/ John R. Garza, Bar #01921
　　　　　　　　　　　　　John R. Garza, Bar # 01921
　　　　　　　　　　　　　Garza, Regan & Associates
　　　　　　　　　　　　　17 West Jefferson St.
　　　　　　　　　　　　　Rockville, MD 20850
　　　　　　　　　　　　　(301) 340-8200