IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CENTRO TEPEYAC

    v.                     :   Civil Action No. DKC 10-1259

MONTGOMERY COUNTY, et al.

## MEMORANDUM OPINION

Several motions are presently pending in this action under the First and Fourteenth Amendments: (1) a motion to dismiss or, in the alternative, for summary judgment (ECF No. 5) filed by Defendants; (2) a motion for a preliminary injunction (ECF No. 6) filed by Plaintiff; and (3) a motion to strike (ECF No. 19) filed by Defendants. A hearing was held and the parties have briefed the issues. For the reasons that follow, Defendants' motion to strike will be denied, while their motion to dismiss will be denied in part and granted in part. Plaintiff's motion for a preliminary injunction will be granted in part and denied in part.

## I.  Background

### A.  Factual Background

On February 2, 2010, Defendant Montgomery County Council, acting as the County Board of Health, passed Resolution Number 16-1252 ("the Resolution"). The Resolution requires "Limited Service Pregnancy Resource Centers" ("LSPRCs") to make certain

disclaimers. (ECF No. 5-1). An LSPRC is defined within the Resolution as any "organization, center, or individual" that "(A) has a primary purpose to provide pregnancy-related services; (B) does not have a licensed medical professional on staff;[1] and (C) provides information about pregnancy-related services, for a fee or as a free service." (*Id.* at 2). The Resolution further defines "licensed medical professional on staff" as "one or more individuals" who:

> (A) are licensed by the appropriate State agency under Title 8, 14, or 15 of the Health Occupations Article of the Maryland Code;
>
> (B) provide medical-related services at the Center by either:
>
>> (i) providing medical services to clients at the Center at least 20 hours per week; or
>>
>> (ii) directly overseeing medical services provided at the Center; and

---

[1]    This portion of the definition renders the Resolution distinguishable from a similar ordinance passed by the City of Baltimore and declared unconstitutional in a recent case in this district. *See O'Brien v. Mayor & City Council of Baltimore*, No. MJG-10-760 (D.Md. Jan. 28, 2011), ECF No. 32. The Baltimore ordinance defined an LSPRC as any person "(1) whose primary purpose is to prove pregnancy-related services; and (2) who (i) for a fee or as a free service; provides information about pregnancy-related services; but (ii) does not provide or refer for: (A) abortions; or (B) nondirective and comprehensive birth-control services. *See id.*, ECF No. 1-1, at 1-2.

(C) are employed by or offer services at
the Center.

The Resolution obliges any LSPRC to post a sign in its waiting room that reads: (1) "the Center does not have a licensed medical professional on staff;" and (2) "the Montgomery County Health Officer encourages women who are or may be pregnant to consult with a licensed health care provider."[2] (*Id.*). The sign must be conspicuously posted, easily readable, and written in English and Spanish. (*Id.*). Violation of the Resolution is a Class A civil violation. (*Id.*). The Resolution may be enforced by a court action initiated by the County Attorney or a citation issued by the Department of Health and Human Services. (*Id.* at 3).

The County Council passed the Resolution after holding a public hearing on December 1, 2009. (*Id.* at 1). According to the Resolution's Background section, the evidence in the record led the County Council to conclude that "a disclaimer for certain pregnancy resources centers [was] necessary to protect

---

[2] Again, the Resolution's required statements are different than those found in the Baltimore ordinance addressed in *O'Brien* and discussed above. That ordinance required any LSPRC to "provide its clients and potential clients with a disclaimer substantially to the effect that the center does not provide or make referral for abortion or birth-control services." *See O'Brien v. Mayor & City Council of Baltimore*, No. MJG-10-760 (D.Md. Jan. 28, 2011), ECF No. 1-1, at 2.

the health of County residents." (*Id.*). In particular, the Council was concerned that:

> . . . clients may be misled into believing that a Center is providing medical services when it is not. Clients could therefore neglect to take action (such as consulting a doctor) that would protect their health or prevent adverse consequences, including disease, to the client or the pregnancy.

(*Id.*).

Plaintiff Centro Tepeyac is a non-profit corporation that, according to the complaint, "discusses pregnancy options with women in . . . Montgomery County." (ECF No. 1 ¶ 11). Among other things, Centro Tepeyac provides "pregnancy testing, referral services, . . . confidential discussion of pregnancy options[,] . . . information on parenting and post-abortion guidance[,] . . . [and] practical support in the form of diapers, baby clothes, and other needed items." (*Id.* ¶ 12). Plaintiff does not refer for or provide abortions. (*Id.* ¶ 14). All services are offered free of charge. (*Id.* ¶ 13). Plaintiff considers itself an LSPRC. (ECF No. 1-6, at 6).

**B.   Procedural Background**

On May 19, 2010, Plaintiff filed a complaint asserting two violations of 42 U.S.C. § 1983: deprivation of a First Amendment right and deprivation of a Fourteenth Amendment right. (ECF No. 1). The complaint included, among other things, a

request for a preliminary injunction.[3]   (ECF Nos. 1, at 12; 1-6).

On June 3, 2010, Defendants filed an "opposition to motion for preliminary injunction and motion to dismiss or, in the alternative, for summary judgment."   (ECF No. 5).   Plaintiff filed a response to the motion to dismiss on June 17, 2010 via a paper that also served as its reply brief on the preliminary injunction motion.   (ECF No. 17).   In their own reply brief on the motion to dismiss on June 28, Defendants included a one-paragraph motion to strike several footnotes in Plaintiff's June 17 filing.   (ECF No. 19).   The court then held a hearing on all three motions on July 23, 2010.   (ECF No. 23).

## II.  Motion to Strike

Defendants move to strike several footnotes in Plaintiff's opposition to the motion to dismiss.   (ECF No. 19, at 6).   The only provision allowing a motion to strike is Federal Rule of Civil Procedure 12(f).   Rule 12(f) allows a court to strike certain matters "from a pleading."   Defendants' motion to strike does not seek to strike any portion of a pleading, but rather certain footnotes in a memorandum opposing a motion.   Under Rule 7(a), motions, memoranda, and the exhibits attached to them are not pleadings.   *See Manson v. Inge*, 13 F.2d 567, 568 (4th Cir.

---

[3]    Later, on June 10, 2010, Plaintiff filed a separate motion for a preliminary injunction.  (ECF No. 6).

1926) (defining pleadings).   Rule 12(f) may only address the papers listed in Rule 7(a).  *See, e.g.*, *Hrivnak v. NCO Portfolio Mgmt, Inc.*, 723 F.Supp.2d 1020, 1029 (N.D.Ohio 2010) ("While some courts have employed Fed.R.Civ.P. 12(f) to strike an affidavit or a brief, or portions thereof, there is no basis in the Federal Rules for doing so.").   Therefore, Defendants' motion to strike will be denied.

## III. Motion to Dismiss

### A.   Standard of Review

Defendants have moved to dismiss pursuant to Rule 12(b)(6). (ECF No. 5).   The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).   At this stage, the court must consider all well-pleaded allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff.   *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).   In addition to the complaint itself, a court may consider "any documents that are attached to it."   *CACA Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009).

In evaluating the complaint, the court need not accept unsupported legal allegations. *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Nor must it agree with legal conclusions couched as factual allegations, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

**B.   Analysis**

**1.   Proper Defendants**

The complaint asserts claims against Montgomery County, the Montgomery County Council, the Montgomery County Department of Health and Human Services, and Montgomery County Attorney Marc Hansen. The claims against the Department of Health and Human Services must be dismissed because that department is not a separate, legally cognizable unit capable of being sued. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 874 (4th Cir. 1989). Rather, it is simply an agency of the county. *Menefee v. State*,

12 A.3d 153, 158-61 (Md. 2011).  The claims against Mr. Hansen must also be dismissed.  A suit against a government agent in his official capacity is treated as a suit against the governmental unit itself.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).  Such a claim is duplicative when the governmental entity itself is a defendant.  *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004); *accord Sheaffer v. Cnty. of Cheatham*, 337 F.Supp.2d 709, 721 (M.D.N.C. 2004).  Thus, two defendants will remain: Montgomery County and the Montgomery County Council.[4]

### 2.  First Amendment Claim

Plaintiff attacks the Resolution on several First Amendment grounds.  Among other things, Plaintiff argues that the Resolution is a content-based restriction on speech, that it amounts to viewpoint-based discrimination, that it is an unconstitutional prior restraint, that it inappropriately compels speech, and that it is unconstitutionally overbroad.  At this point, it is unnecessary to address each of the individual allegations; it is enough to say that the complaint states a claim that the Resolution unconstitutionally compels speech.

---

[4]   In their original motion to dismiss, Defendants also argued that the Montgomery County Council had not properly been served.  (ECF No. 5, at 13).  The Council has now been served. (ECF No. 22).

"[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). In several cases spanning almost 70 years, the Supreme Court has found violations of the First Amendment where private individuals are forced to propound government-dictated messages. *See, e.g.*, *id.*; *Miami Hearld Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974); *Talley v. California*, 362 U.S. 60 (1960); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). These cases reflect a concern that, in compelling speech, "the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).

### a. Level of Scrutiny

All parties would seem to agree that the Resolution requires Plaintiff to say something it might not otherwise say. Because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," laws that compel speech are ordinarily deemed "content-based regulation[s] of speech" subject to strict scrutiny. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988); *see also*

*Turner Broad.*, 512 U.S. at 642 ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to . . . rigorous scrutiny."). There are situations – exceptions to the general rule - when strict scrutiny will not apply. For example, a lesser degree of scrutiny applies when the only speech involved is commercial speech. *See generally Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S.Ct. 1324 (2010) (applying rational basis standard); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985) (same). "Exacting scrutiny" applies to compelled disclosures and reporting in the campaign finance context. *See Citizens United v. Fed. Election Comm'n*, 130 S.Ct. 876, 914 (2010); *see also N.C. Right to Life Comm. Fund for Indep. Political Expenditures v. Leake*, 524 F.3d 427, 439 (4th Cir. 2008) (distinguishing between "strict scrutiny" and "exacting scrutiny"). And if a law compels speech for reasons entirely unrelated to content, an intermediate level of scrutiny would seem to apply. *Turner*, 512 U.S. at 662 (plurality opinion).[5]

---

[5]    The Resolution is not "content-neutral" in the manner of the regulations discussed in *Turner Broadcasting*. At the very least, the Resolution's disclosure requirements are activated in part by a particular message. *Turner Broad.*, 512 U.S. at 654-55. Although Defendants suggest that the trigger is the absence of a licensed medical professional, the Resolution

Defendants contend that this case presents another instance where strict scrutiny should not apply. Drawing from two lines of cases – commercial disclosure cases and professional disclosure cases – they argue that truthful and purely factual disclosure laws do not merit strict scrutiny. They characterize the Resolution as nothing more than such a permissible factual disclosure requirement. Even assuming that the Resolution could be called a factual disclosure requirement,[6] the two categories of cases relied upon by Defendants do not justify use of a lower level of scrutiny.

---

is also triggered by the "provision of information about pregnancy-related services." Moreover, in this case it is the government itself that is prescribing the content of the compelled message. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980) (emphasizing importance of the fact that a "specific message is dictated by the State"). As *Riley* notes, 487 U.S. at 795, the fact that particular content is compelled by the Resolution necessarily renders it content-based: "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech."

[6] The latter part of the statute, which "encourages women who are or may be pregnant to consult with a licensed health care provider," may not be a factual disclosure. To the extent the required disclosure communicates a subjective and opinion-based message, it would be subject to strict scrutiny. *See Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006).

First, the speech implicated in this case is not commercial speech and commercial speech concepts cannot be extended to this context.

Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). Specifically, it is "speech that 'proposes a commercial transaction.'" *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 440 (4th Cir. 1999) (quoting *Board of Trustees v. Fox*, 492 U.S. 469, 473 (1989)) (brackets removed). Commercial speech is often regarded as being less entitled to First Amendment protection than non-commercial speech. *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *Zauderer*, 471 U.S. at 637; *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64-65 (1983); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). Because commercial speech "is linked inextricably with the commercial arrangement that it proposes, . . . the State's interest in regulating the underlying transaction may give it a concomitant interest in the expression itself." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (citations and quotation marks omitted).

In the commercial speech context, the Supreme Court has used rational basis review in evaluating laws that required

individuals to disclose "purely factual and uncontroversial information about the terms under which [their] services will be available." *Zauderer*, 471 U.S. at 651; *see also Milavetz*, 130 S.Ct. at 1340 (applying rational basis standard to "disclosures [that] entail[ed] only an accurate statement identifying the advertiser's legal status and the character of the assistance provided"). When these sorts of "factual" commercial disclaimer laws apply to inherently misleading statements, they are upheld "as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." 471 U.S. at 651. Some courts have suggested that the standard described in *Zauderer* controls all cases involving truthful, compelled commercial speech, even if the disclosure requirements are not intended to prevent consumer fraud. *See N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 133 (2[d] Cir. 2009); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 n.8 (1st Cir. 2005); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2[d] Cir. 2001).

Defendants have not taken any definite position as to whether the Resolution regulates commercial speech, but the Resolution would seem to apply to non-commercial speech. By its terms, the Resolution reaches entities that "provide[] information about pregnancy-related services, for a fee *or as a*

*free service*." (ECF No. 1-2, at 2 (emphasis added)). Plaintiff itself provides "services including pregnancy testing, referral services, and confidential discussion of pregnancy options," all free of charge. (ECF No. 1, Compl. ¶¶ 12-13). In providing these services, there is no indication that Plaintiff is acting out of economic interest. Rather, Plaintiff is allegedly motivated by social concerns. *Cf. In re Primus*, 436 U.S. 412, 437-38 & n.32 (1978) (applying higher level of scrutiny where lawyer offered free legal services for the purposes of the "advancement of beliefs and ideas," as opposed to services offered for commercial gain). Nor does any of the speech here "propose a commercial transaction," as Plaintiff does not engage in any commercial transactions with its patrons at all. *See, e.g.*, *Black's Law Dictionary* (9th ed. 2009) (defining commerce as the "exchange," as opposed to free provision, "of goods and services").[7] *See, e.g.*, *O'Brien v. Mayor & City Council of Baltimore*, No. MJG-10-760, slip op. at 17-18 (D.Md. Jan. 28,

---

[7]     Even if some aspects of Plaintiff's speech were categorized as commercial, the facts alleged suggest that such commercial speech would at least be "intertwined with informative and perhaps persuasive speech." *Riley*, 487 U.S. at 796 (quotation marks omitted). When speech contains elements of both fully protected and less protected speech, "we cannot parcel out the speech, applying one test to one phrase and another test to another phrase." *Id*. Instead, the Supreme Court has indicated that the test for fully protected expression should apply. *Id*.

14

2011), ECF No. 32 (finding that offering of free services by pregnancy center did not render its speech commercial).

Defendants suggest that the commercial disclosure cases described above "have bearing" on the standard of scrutiny applicable in this case even if the Resolution concerns non-commercial speech. But the fact that the Supreme Court has approved of factual disclosure requirements as to commercial speech does not mean it endorses such requirements for all forms of speech. As a general matter, concepts from the commercial arena cannot be so easily transplanted into a non-commercial context. *Ohralik*, 436 U.S. at 456 ("To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech."). In fact, the Supreme Court has said that the deferential approach to factual disclosure and disclaimer requirements found in *Zauderer* is largely limited to the realm of commercial speech.

> Although the State may at times prescribe what shall be orthodox in commercial advertising by requiring the dissemination of "purely factual and uncontroversial information," outside that context it may not compel affirmance of a belief with which the speaker disagrees. Indeed this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or

> endorsement, but equally to statements of
> fact the speaker would rather avoid,
> subject, perhaps to the permissive law of
> defamation.

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557, 573 (1995) (citations omitted) (quoting *Zauderer*,
471 U.S. at 651); *see also Riley*, 487 U.S. 781, 796 (1988)
("Purely commercial speech is more susceptible to compelled
disclosure requirements."). In addition, contrary to
Defendants' contention, it does not matter in the non-commercial
context whether a law compels factual disclaimers or ideological
statements; the Supreme Court's compelled speech precedents
apply with full force to either type of statement.

> These cases cannot be distinguished simply
> because they involved compelled statements
> of opinion while here we deal with compelled
> statements of "fact": either form of
> compulsion burdens protected speech. . . .
> Although the foregoing factual information
> might be relevant to the listener, . . . a
> law compelling its disclosure would clearly
> and substantially burden the protected
> speech.

*Riley*, 487 U.S. at 797-98; *see also, e.g.*, *Axson-Flynn v.
Johnson*, 356 F.3d 1277, 1284 (10th Cir. 2004) (collecting cases
and noting that, in addition, "it is difficult to imagine a
standard by which a court could determine whether non-commercial
speech is or is not ideological"); *cf. Buckley v. Valeo*, 424
U.S. 1, 64 (1976) ("[W]e have repeatedly found that compelled

16

disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."). Therefore, Defendants cannot rely on commercial speech cases involving "factual disclosures" to justify a lesser degree of scrutiny.

Second, Defendants attempt to analogize this case to certain cases addressing abortion-related disclosures. Those cases, along with the broader doctrine of professional speech they implicate, do not apply here either.

Defendants first cite *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992), in which a plurality of the Supreme Court upheld a state requirement that doctors disclose certain information about abortion to women seeking the procedure. The plurality rejected the argument that these disclosures constituted unconstitutional compelled speech in a single paragraph:

> All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. To be sure, the physician's First Amendment rights not to speak are implicated, see *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, cf. *Whalen v. Roe*, 429 U.S. 589, 603, 97 S.Ct. 869, 878, 51 L.Ed.2d 64 (1977). We see no constitutional infirmity in the requirement

> that the physician provide the information
> mandated by the State here.

*Id.* A later Supreme Court decision, *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), reaffirmed that states have a "significant role to play in regulating the medical profession" and upheld certain additional abortion-related disclosures mandated by a federal statute. One court, the United States Court of Appeals for the Eighth Circuit, has since read *Casey* and *Gonzales* to mean that, "while the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion." *Planned Parenthood Minn., N.D., S.D., v. Rounds*, 530 F.3d 724, 434-35 (8th Cir. 2008).

Plaintiff in this case is not a physician offering abortion services. Yet cases such as *Casey* and *Rounds* might be exemplars of a broader category of speech more amendable to compulsion than ordinary speech: professional speech. *See* David Halberstam*, Commercial Speech, Professional Speech, & The Constitutional Status of Social Institutions*, 147 U. Pa. L. Rev. 771, 773 (1999) (characterizing *Casey* as the "only . . . holding expressly confronting the First Amendment protection of professional speech"). In a manner similar to the commercial speech context, *Casey*'s rationale might indicate that burdens on

18

professional speech are more susceptible to disclosure requirements in light of the government's interest in regulating the underlying profession. "Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession." *Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring); *but see Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) ("Being a member of a regulated profession does not, as the government suggests, result in a surrender of First Amendment rights."). Although *Casey* and *Rounds* address medicine, a broader approach encompassing all professional speech could reach any number of activities. *See, e.g.*, *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1053-55 (9th Cir. 2000) (psychologists and psychoanalysts); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992) (lawyers); *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 603-05 (4th Cir. 1988) (accountants); *Locke v. Shore*, 682 F.Supp.2d 1283, 1290-92 (N.D.Fla. 2010) (interior designers).

Assuming that professional speech is subject to a lesser degree of scrutiny, the question then becomes whether Plaintiff's speech can be fairly labeled professional speech. Although professional speech is sometimes difficult to define

with precision, several courts have looked to Justice White's concurrence in *Lowe v. SEC*, 472 U.S. 181 (1985), for guidance. *See, e.g.*, *Locke*, 682 F.Supp.2d at 1291-92; *Taucher v. Born*, 53 F.Supp.2d 464, 477 (D.D.C. 1999); *In re Rowe*, 80 N.Y.2d 336, 342 (1992). Indeed, the United States Court of Appeals for the Fourth Circuit has indicated that Justice White's concurrence provides "sound, specific guidelines" for defining professional speech. *Accountant's Soc'y*, 860 F.2d at 604.

In his *Lowe* concurrence, Justice White suggested that professional speech occurs when a party offers individualized advice that engenders a relationship of trust with a client:

> One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession. Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession. . . . Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such.

472 U.S. at 232; *accord Accountant's Soc.*, 860 F.2d at 604
(holding that speech restriction on accountants was permissible
regulation of a profession because accountants "exercise their
professional judgment in making individualized assessments of
each client's financial situation, for which they are
compensated by the client"). Justice White built upon the
"instructive" concurring opinion of Justice Jackson in *Thomas v.
Collins*, 323 U.S. 516, 544-45 (1945). Although not making the
distinction explicit, Justice Jackson's opinion also recognized
the difference between individualized, professional speech and
generalized speech related to traditionally "professional"
subject matter:

> [A] rough distinction always exists, I
> think, which is more shortly illustrated
> than explained. A state may forbid one
> without its license to practice law as a
> vocation, but I think it could not stop an
> unlicensed person from making a speech about
> the rights of man or the rights of labor, or
> any other kind of right, including
> recommending that his hearers organize to
> support his views. Likewise, the state may
> prohibit the pursuit of medicine as an
> occupation without its license, but I do not
> think it could make it a crime publicly or
> privately to speak urging persons to follow
> or reject any school of medical thought.
> . . .
>
> This wider range of power over pursuit of a
> calling than over speech-making is due to
> the different effects which the two have on
> interests which the state is empowered to
> protect. The modern state owes and attempts

21

> to perform a duty to protect the public from
> those who seek for one purpose or another to
> obtain its money.  When one does so through
> the practice of a calling, the state may
> have an interest in shielding the public
> against the untrustworthy, the incompetent,
> or the irresponsible, or against
> unauthorized representation of agency.

(quoted in *Lowe*, 472 U.S. at 231).  Thus, the concurrences of Justices White and Jackson suggest that speech may be labeled "professional speech" when it is given in the context a quasi-fiduciary - or actual fiduciary - relationship, wherein the speech is tailored to the listener and made on a person-to-person basis.[8]

Even if one assumes that professional speech is subject to a lower level of scrutiny, and even if the broadest interpretation of the professional speech doctrine is applied, it cannot be said at this stage that the Resolution is merely a regulation of a profession with incidental effects on speech. The Resolution applies to entities that, among other things, "provide[] information about pregnancy-related services."  Thus, the terms of the Resolution are not limited to those that offer

---

[8]    Justice Jackson's opinion might be read to include a third element:  the speech must occur in the context of a "vocation," that is, in connection with the performance of a service for money.  Because Plaintiff does not perform its services for payment, its speech would not constitute professional speech under this extended definition.

individualized advice, but rather extend to any information provider. Plaintiff, for instance, states that it "seek[s] to talk to women about their options and provide practical support for pregnant women free of charge." (ECF No. 1 ¶ 2). More specifically, Plaintiff alleges that it provides "services including pregnancy testing, referral services, and confidential discussion of pregnancy options." (*Id.* ¶ 12). Although these discussions and services occur in person-to-person situations, there is no suggestion that Plaintiff tailors its advice to particular cases. Instead, Plaintiff characterizes its role as a more generic "information provider." (*Id.* ¶¶ 12, 14, 15, 46).

The complaint could be read to allege that Plaintiff merely provides information to women, who are then left to decide on their own whether and how to use Plaintiff's pregnancy-related information. This mere provision of information would not seem to be enough to create the type of quasi-fiduciary relationship contemplated by the *Lowe* and *Thomas* concurrences. Not every offering of advice or information creates a relationship of trust. Otherwise, the distinction illustrated in *Lowe* and *Thomas* between discussion of professional subject matter and practice of a profession would be rendered meaningless.

Because the Resolution does not pertain to commercial, professional, or any other form of speech calling for a lower level of scrutiny, strict scrutiny applies.

### b.  Strict Scrutiny Review

In a different context, the Supreme Court has observed that "[s]trict scrutiny is not strict in theory, but fatal in fact." *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003).  Thus, the choice of strict scrutiny does not end the analysis.  The Resolution may still be upheld and the complaint dismissed if Defendants demonstrate that the Resolution is "1) narrowly tailored to 2) promote a compelling government interest." *PSINet, Inc. v. Chapman*, 362 F.3d 227, 233 (4th Cir. 2004).

The Resolution itself states the government interest that spurred its passage: the Board's concern "that clients may be misled into believing that a Center is providing medical services when it is not . . . [and] therefore neglect to take action (such as consulting a doctor) that would protect their health." (ECF No. 1-2, at 1).

It may be that the government has a compelling interest in ensuring that its citizenry are able to obtain needed medical care.  *Cf. Am. Life League, Inc. v. Reno*, 47 F.3d 642, 656 (4th Cir. 1995) (noting, in Free Exercise Clause challenge, that government has compelling interest in "promoting unobstructed

24

access to reproductive health facilities"). The interest in ensuring patients obtain appropriate medical care might fall within the ambit of the state's broader interest in preserving public health. *See Aid for Women v. Foulston*, 441 F.3d 1101, 1119-20 (10th Cir. 2006); *cf. Varandani v. Bowen*, 824 F.2d 307, 311 (4th Cir. 1987) (observing, in Due Process context, that government has "compelling interest in assuring safe health care for the public"). Of course, to invoke such a compelling interest, Defendants would need to "demonstrate that the harms are real, not merely conjectural, and that the [Resolution] will in fact alleviate these harms in a direct and material way." *Turner Broad.*, 512 U.S. at 664.

But even if one accepts the idea that the Resolution was intended to promote a real and compelling government interest, it cannot be said as a matter of law that the entire Resolution was narrowly tailored to promote that interest. *Wooley*, 430 U.S. at 716. "Action taken to remedy an 'evil' will be considered 'narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy.'" *Columbia Union Coll. v. Clarke*, 159 F.3d 151, 157 n.2 (4th Cir. 1998) (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). "If a less restrictive alternative would serve the Government's

purpose, the legislature must use that alternative." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

In this case, Defendants have not shown, based on the facts alleged in the complaint, that the second portion of the disclaimer required by the Resolution, which "encourages women who are or may be pregnant to consult with a licensed health care provider," inarguably serves the Resolution's stated purpose in any obvious way. The Resolution was evidently intended to ensure that women did not forgo medical treatment that they would otherwise obtain after visiting an LSPRC. Defendants' interest in avoiding such a mistake might be satisfied once women were aware that LSPRCs do not staff a medical professional. To the extent that the second portion of the required disclaimer may compel unneeded speech, that statement would not be the least restrictive means of achieving a relevant government interest. If that one portion of the Resolution is not narrowly tailored, that portion would not survive strict scrutiny.[9] Therefore, the complaint states a

─────────────

[9]    In addition, several options less restrictive than compelled speech could be used to encourage pregnant women to see a licensed medical professional. For example, Defendants could post notices encouraging women to see a doctor in county facilities or launch a public awareness campaign. *See Entm't Software Ass'n*, 469 F.3d at 650-51 (citing educational campaigns as less restrictive alternatives).

claim based on the infringement of Plaintiff's First Amendment rights.

### 3.    Fourteenth Amendment Claim

In a single page, Defendants move to dismiss count two of the complaint, which relies on the Fourteenth Amendment. In particular, Plaintiff's complaint asserts various violations of the Equal Protection Clause and the Due Process Clause. Plaintiff's response to Defendants' motion to dismiss never directly addresses these issues.

The Fourteenth Amendment issues, particularly the Equal Protection claims, are to some extent entangled with the First Amendment issues. *Fraternal Order of Police v. Mayor & City Council of Ocean City, Md.*, 916 F.2d 919, 924 (4th Cir. 1990) ("[G]overnment action which allegedly permits some to speak, but denies the opportunity to others raises an equal protection claim that is closely intertwined with First Amendment interests."). The earlier determination that the Resolution implicates the First Amendment, for instance, likely means that the Resolution is also subject to strict scrutiny under the Fourteenth Amendment. *Palmer v. City Nat'l Bank of W. Va.*, 498 F.3d 236, 246 (4th Cir. 2007) (stating that a regulation is subject to strict scrutiny if it "impinges on a fundamental right"); *Nat'l Fed'n of the Blind v. FTC*, 303 F.Supp.2d 707, 724

(D.Md. 2004) ("Rights protected by the First Amendment are fundamental rights."). Yet Plaintiff largely neglects this issue in its brief, while Defendants rely on the notion that rational basis review applies. Neither approach is helpful. Because the First Amendment claims will be permitted to proceed, and because strict scrutiny is likely to apply as to the Fourteenth Amendment claims, it would be inappropriate to dismiss the closely related Fourteenth Amendment claims without the benefit of full briefing.

## IV. Motion for Preliminary Injunction

### A. Standard of Review

Plaintiff seeks a preliminary injunction against enforcement of the Resolution. (ECF No. 6). "A preliminary injunction is an extraordinary remedy." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds by* 130 S.Ct. 2371 (2010) *and reissued in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010). To obtain a preliminary injunction, a plaintiff must establish four elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 364 (quoting *Winter v. Natural Res. Def. Council, Inc.*,

28

129 S.Ct. 365, 374 (2008)).  Plaintiff must prove each of the four elements to obtain relief.  *Id.*

**B.  Analysis**

In its motion for a preliminary injunction, Plaintiff asserts two basic reasons why it believes it will succeed in overturning the Resolution:  the Resolution is impermissibly vague and it infringes on Plaintiff's First Amendment rights. Both parties take an all-or-nothing approach, maintaining that the entire Resolution amounts to (or does not amount to) unconstitutional compelled speech.  Yet the Resolution mandates two separate statements – one pertaining to the absence of a "licensed medical professional" and the other stating Montgomery County's belief that pregnant women should visit such a professional.  These different statements potentially raise, as noted above, different First Amendment concerns.

Of course, if only one portion of the Resolution is constitutionally unsound, the next question would be whether the unconstitutional portion may be severed from the remainder of the Resolution.  Whether severance of a state or local enactment is appropriate is a question answered by reference to state law. *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 627 (4th Cir. 2002); *Muller v. Curran*, 889 F.2d 54, 57 (4th Cir. 1989).  In Maryland,

the legislative intent determines whether an offending provision may be severed. *Park v. Bd. of Liquor License Comm'rs for Baltimore City*, 338 Md. 366, 382 (1995); *accord Sugarloaf Citizens Ass'n, Inc. v. Gudis*, 319 Md. 558, 573-74 (1990). "Under Maryland law, there is a strong presumption that if a portion of an enactment is found to be invalid, the intent of the legislative body is that such portion be severed."[10] *Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 596 (2001) (quotation marks and brackets omitted). "This presumption has never been limited solely to bills enacted by the General Assembly, but has been applied to local ordinances" and other enactments. *Id.*

Although the parties have not addressed the issue of severability, it appears that there is nothing in the Resolution to dispel the ordinary presumption of severability. At this stage, this would not seem to be an instance where "the provisions are so connected that it cannot be presumed that the Legislature would have passed one without the other." *Park*, 338

---

[10] The Resolution itself contains a severability clause (ECF No. 5-1, at 3), and the Montgomery County Code contains a similar provision, *see* Montgomery County Code § 1-202. "But a severability clause of this sort adds little to the basic presumption of severability, for such a clause is merely declaratory of an established rule of construction; it is an aid merely, not an inexorable command." *Sugarloaf*, 319 Md. at 574 n.11.

30

Md. at 382 (quotation marks omitted). This likely finding of severability makes it even more appropriate to treat each required statement separately.

## 1. Vagueness

Plaintiff has not shown a likelihood of success as to its vagueness claim. A potentially vague law that interferes with First Amendment rights deserves greater scrutiny "because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-72 (1997). A regulation may be deemed impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Plaintiff suggests the Resolution does not meet this fair notice standard because it contains several undefined phrases, including "has a primary purpose," "medical-related services," "medical services," and "directly overseeing." It then offers a series of hypotheticals that it contends illustrate the vagueness of the Resolution's language. Such allegations do not amount to a clear showing of likelihood of success. A failure by a statute to define all of its terms does not necessarily render it impermissibly vague. *Rose v. Locke*, 423 U.S. 48, 50 (1975) ("Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial

opinions before they may say with any certainty what some statutes may compel or forbid."). Speculation about hypothetical situations where the Resolution's proper interpretation is unclear also is not enough. *Hill*, 530 U.S. at 703; *see also Williams*, 553 U.S. at 306. Even when a regulation implicates the First Amendment, "perfect clarity and precise guidance have never been required." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

##### 2. Compelled Speech

Plaintiff has made, however, a clear showing that it is likely to succeed on one part of its First Amendment claim. As has already been explained, strict scrutiny is likely to apply to the Resolution. To show likelihood of success, Plaintiff must establish that Defendants will be unable to show that the Resolution addresses a compelling governmental interest and is narrowly tailored.

Plaintiff has not shown that Defendants will be unable to meet that test for the first part of the Resolution requiring a disclaimer that no licensed medical professional is on staff. As discussed above, the interest in public health and access to medical care may be described as compelling. And, the record is at least colorable at this stage to suggest that the disclaimer is narrowly tailored to meet the interest: only requiring those

LSPRCs to post a notice that a licensed medical professional is not on staff. It does not require any other specific message and in neutral language states the truth.

Although Plaintiff has not shown that the first part of the Resolution will fail to survive strict scrutiny review, the same cannot be said for the second portion. As the analysis on the motion to dismiss indicates, Plaintiff has sufficiently established that Defendants are unlikely to show that the second portion of the required disclaimer is narrowly tailored to serve a compelling government interest.

As to irreparable harm, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Consequently, the Fourth Circuit has generally found irreparable injury where a plaintiff has demonstrated a likelihood of success on a First Amendment claim. *See Newsom ex rel. Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("[T]he Supreme Court has explained that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). There is no reason

to depart from the ordinary rule in this case; Plaintiff has shown irreparable harm.

Regarding the final two factors – balance of the equities and the consideration of the public interest – the Fourth Circuit has also found these factors established when there is a likely First Amendment violation. A government is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *accord Newsom*, 354 F.3d at 261. In addition, "upholding constitutional rights surely serves the public interest." *Carandola*, 303 F.3d at 521; *accord Newsom*, 354 F.3d at 261.

Plaintiff requests that Defendants be enjoined from enforcing the entire Resolution. "Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends. Particularly is this so when preliminary relief, on something less than a full record and full resolution of the facts, is granted." C*onsolidation Coal Co. v. Disabled Miners of S.W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971). Because Plaintiff has demonstrated a likelihood of success as to only one portion of

the Resolution, only the enforcement of that portion of the Resolution should be enjoined. Defendants will be enjoined from enforcing the Resolution's requirement that LSPRCs post a sign indicating that "the Montgomery County Health Officer encourages women who are or may be pregnant to consult with a licensed health care provider."

## V. Conclusion

For the foregoing reasons, Defendants' motion to strike will be denied, while their motion to dismiss will be denied in part and granted in part. Plaintiff's motion for a preliminary injunction will be granted in part and denied in part.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
