IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CENTRO TEPEYAC

    v.

MONTGOMERY COUNTY, et al.

          :   Civil Action No. DKC 10-1259

## MEMORANDUM OPINION

Presently pending and ready for resolution in this action arising under the First and Fourteenth Amendments are the motion for summary judgment filed by Plaintiff Centro Tepeyac ("Centro Tepeyac") (ECF No. 68) and the cross-motion for summary judgment filed by Defendants Montgomery County and Montgomery County Council (collectively, "the County") (ECF No. 70). The issues are fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons that follow, the Plaintiff's motion will be granted in part and the County's motion will be denied.

## I. Background

### A. Factual Background

On February 2, 2010, the Montgomery County Council passed Resolution Number 16-1252 ("the Resolution"). The Resolution requires "Limited Service Pregnancy Resource Centers" ("LSPRCs") to make certain disclaimers. (ECF No. 48-5). An LSPRC is

defined as any "organization, center, or individual" that "(A) has a primary purpose to provide pregnancy-related services; (B) does not have a licensed medical professional on staff; and (C) provides information about pregnancy-related services, for a fee or as a free service." (*Id.* at 2). The Resolution further defines "licensed medical professional on staff" as "one or more individuals" who:

> (A) are licensed by the appropriate State agency under Title 8, 14, or 15 of the Health Occupations Article of the Maryland Code;
> (B) provide medical-related services at the center by either:
> (i) providing medical services to clients at the Center at least 20 hours per week; or
> (ii) directly overseeing medical services provided at the Center; and
> (C) are employed by or offer services at the Center.

(*Id.*).

The Resolution obligates any LSPRC to post a sign in its waiting room that reads: (1) "the Center does not have a licensed medical professional on staff"; and (2) "the Montgomery County Health Officer encourages women who are or may be pregnant to consult with a licensed health care provider". (*Id.*). The sign must be easily readable, written in English and Spanish, and "conspicuously posted in the Center's waiting room or other area where individuals await service." (*Id.*). Violation of the Resolution is a Class A civil violation.

(*Id.*).  The Resolution may be enforced by a court action initiated by the County Attorney or a citation issued by the Department of Health and Human Services.  (*Id.* at 3).

The background section of the Resolution states that the County passed the Resolution after holding a public hearing on December 1, 2009, and concluding that "a disclaimer for certain pregnancy resource centers [was] necessary to protect the health of County residents."  (*Id.* at 1).  In particular, the County expressed concern that:

> clients may be misled into believing that a Center is providing medical services when it is not.  Clients could therefore neglect to take action (such as consulting a doctor) that would protect their health or prevent adverse consequences, including disease, to the client or the pregnancy.

(*Id.*).  A similar sentiment was expressed in a January 29, 2010 memorandum to the County Council from Amanda Mihill, a legislative analyst for the County ("Mihill Memoradum"):

> The Council is primarily concerned with ensuring that a pregnant woman is not led to mistakenly believing that an LSPRC is staffed by professionals licensed to give medical advice to patients.  Women who believe they are receiving advice from medical professionals may not take important steps, including consulting appropriate medical professionals, which would protect their health or prevent adverse consequences during the pregnancy.

(ECF No. 48-6, at 2).  The Mihill Memorandum cited two studies to support this view, including a July 2006 report by the

Minority Staff of the United States House of Representatives Committee on Government Reform entitled "False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers." ("Waxman Report"). The Mihill Memorandum cited the study's findings that approximately 87% of the centers contacted provided false or misleading information about the health effects of an abortion, including information about a link between abortion and breast cancer, the effect of abortion on future fertility, and the mental health effects of abortion. (*Id.* at 23). The second report cited was a January 2008 report by the NARAL Pro-Choice Maryland Fund. ("NARAL Report"). NARAL sent volunteers into LSPRCs in Maryland, including Centro Tepeyac, and found that every center visited provided false or misleading information, including "false information about abortion risks, misleading data on birth control, and emotionally manipulative counseling." (*Id.* at 34).

The Mihill Memorandum went on to assess the medical literature and found that most of the medical community does not share the views about the health risks of abortion apparently espoused at LSPRCs, including Centro Tepeyac. While acknowledging that studies reaching opposite conclusions exist and no medical procedure is completely risk-free, "[t]he issue the proposed regulation is designed to address is that some LSPRCs provide their clients with misinformation/incomplete

4

information about their pregnancy options which can negatively affect a woman's decision regarding her pregnancy and health." (*Id.* at 3). The surveyed medical literature consistently recommended prenatal care as early as possible in a woman's pregnancy because it is associated with positive health results. "The proposed regulation would address this health concern by ensuring that clients of LSPRCs understand that the information they are receiving is not necessarily from licensed medical professionals." (*Id.*).

At the Council debate, Councilmember George Leventhal said that as members of the Council's Health and Human Services Committee began understanding the activities of LSPRCs,

> it became clear to us that many services are provided that may be perceived as medically related services including pregnancy tests, sometimes sonograms, and medical and health counseling. With this understanding, the Committee felt it was valid and appropriate public policy to ensure that County residents understand that they are not visiting a medical clinic if the center does not have licensed medical professionals on staff and that pregnant women, women who are or may be pregnant, should see a doctor.

(ECF No. 49-3, at 2). Councilmember Phil Andrews opposed the Resolution, finding that it is unnecessary as he has not received a single complaint from anyone who went to an LSPRC in his eleven years as a Councilmember. (ECF No. 49-3, at 5).

A press release sent after the Resolution's approval from the Office of Councilmember Duchy Trachtenberg, the chief sponsor of the Resolution, stated that "the regulation is needed because some pregnancy centers often provide false and misleading information to women. . . . [LSPRCs] often discourage women from seeking contraception or abortion." (ECF No. 48-8).

Centro Tepeyac is a pro-life Montgomery County non-profit corporation that provides pregnancy services such as pregnancy testing, confidential discussion of pregnancy options, and support to families in the form of diapers and baby clothes. It considers itself a pregnancy center subject to the Resolution. All of its goods and services are provided free of charge, although occasionally a woman will give a personal donation to the center. (ECF No. 49-5, at 22, 43, Trans. 22:14-20, 43:14-24), Deposition of Mariana Vera). Centro Tepeyac does not provide abortions or refer women for abortions. It does not have a licensed medical professional on staff. (ECF No. 48-4 ¶¶ 3, 7, 8). It promises confidentiality to the women it counsels and does not disclose information concerning the counseling sessions without the consent of the woman. (ECF No. 49-4 ¶ 2). Ms. Mariana Vera, Centro Tepeyac's Executive Director, represented in comments submitted to the County Council that "[a]t least half" of the women who take a pregnancy test at

Centro Tepeyac were referred by the public clinics of Montgomery County. (ECF No. 48-6, at 58). Those referrals continued even after passage of the Resolution. (ECF No. 48-4 ¶ 4, Declaration of Mariana Vera). The County-run health centers have compiled a list of private facilities where women can get a pregnancy test. This list includes Centro Tepeyac but nowhere states that Centro Tepeyac does not have licensed medical professionals on staff or that pregnant women should see a licensed healthcare provider. (ECF No. 48-13; *see also* ECF No. 48-10 at 36, Trans. 36:7-23).

According to Ms. Vera,

> The Resolution chills and burdens the free speech rights of Centro Tepeyac, by forcing us to suggest to our clients that we are not qualified to talk with them or to provide them with assistance. Likewise, it chills our free speech rights by forcing us to post a sign suggesting that the County believes they should go elsewhere. The Resolution has chilled and burdened the Center in that it has taken critical time and attention away from our core mission of helping women.

(ECF No. 48-4 ¶¶ 10-11). Ms. Vera took a similar position in her deposition, stating that she did not want the sign being the first thing women see upon entering the center "because what it's communicating is that we are not qualified enough to help these women." (ECF No. 49-5, at 24, Trans. 24:11-12). Ms. Vera believed that pregnancy is more than just medical care; it is holistic and Centro Tepeyac can assist in that holistic sense. (*Id.* at 25-26, Trans. 25:7 – 26:1). Ms. Vera testified that

Centro Tepeyac does not present itself as having medical staff onsite. Any confusion is rare and mostly comes from those who call into the center. Those who come to the center would have no confusion, as the center has "bright colors" and no "medical things" on the walls. (*Id.* at 26-27, Trans. 26:8 – 27:1).

The County provided Dr. Ulder Tillman, Health Officer for Montgomery County and Chief of Public Health Services, as its Rule 30(b)(6) representative. Dr. Tillman stated that she had never received a complaint from someone who sought service at an LSPRC in Montgomery County. (ECF No. 48-10 at 14, Trans. 14:10-14; *id.* at 21, Trans. 21:5-9; *id.* at 43, Trans. 43:20-21). She testified that the concern motivating the law is that women "may be going to certain pregnancy resource centers thinking that it is a medical establishment and then may not be receiving information from a licensed medical professional." (*Id.* at 18, Trans. 18:9-14; *see also id.* at 23, Trans. 23:11-15 ("In terms of speaking for the County, my interest is that women who may be or are pregnant receive or have the opportunity to receive information from a licensed health professional and to know when they are in that situation or not.")). Dr. Ullman had no evidence that any pregnant woman who went to an LSPRC delayed seeking medical care because she believed she had spoken with a licensed medical professional. (*Id.* at 24 and 26, Trans. 24:4-7, 26:3-6).

Dr. Ullman testified that the County has not attempted to spread the Resolution's messages through advertisements in newspapers, radio, television, Facebook, or Twitter; on billboards; on signs in government buildings or pregnancy-related spaces such as maternity stores. Such a strategy has not been employed due to resource constraints and the view – generally shared in the public health community – that targeted messages work better than broad disseminations. (ECF No. 48-10, at 46-51, 73). She testified that as the County Health Officer she has the authority to disseminate the messages reflected in the Resolution but has not recommended that the County do so nor has she been asked to do so. (ECF No. 48-10, at 65, Trans. 65:8-19).

**B.   Procedural Background**

On May 19, 2010, Centro Tepeyac filed a complaint asserting two violations of 42 U.S.C. § 1983:   (1) deprivation of its First Amendment rights, and (2) deprivation of its Fourteenth Amendment right to equal protection.   (ECF No. 1).   The complaint included a request for both preliminary and permanent injunctive relief.   On June 3, 2010, the County filed an "opposition to motion for preliminary injunction and motion to dismiss or, alternatively, for summary judgment." (ECF No. 5). Centro Tepeyac thereafter filed a separate motion for preliminary injunction and opposed the County's motion to

dismiss. (ECF Nos. 6, 17). The court held a hearing on each of these motions on July 23, 2010.

On March 15, 2011, the court issued a memorandum opinion and order granting in part and denying in part both the motion to dismiss and the motion for a preliminary injunction. (ECF Nos. 26-27). With regard to the preliminary injunction request, the court denied the motion as to the first statement required by the Resolution (no licensed medical professional on staff) and granted the motion as to the second mandated statement (encouraging pregnant women to consult licensed health care provider). The County then answered the complaint, and the parties began discovery.[1] On November 1, 2011, Centro Tepeyac filed a motion for summary judgment. (ECF No. 48). Two weeks later, the County submitted an opposition and cross-motion for summary judgment. (ECF No. 49). Both motions have since been fully briefed.

Shortly before beginning discovery, the County appealed the preliminary injunction prohibiting enforcement of the Resolution's second statement, and Centro Tepeyac cross-appealed the denial of its motion with respect to the first statement.

---

[1] During discovery, Centro Tepeyac filed an amended complaint. The amended complaint alleged the § 1983 claims set forth in the original complaint, as well as a claim for violation of Article 40 of the Declaration of Rights of the Maryland Constitution. (ECF No. 41).

Following briefing and oral argument, a panel of the United States Court of Appeals for the Fourth Circuit issued an opinion affirming in part and reversing in part the court's resolution of Centro Tepeyac's preliminary injunction motion. *Centro Tepeyac v. Montgomery Cnty.*, 683 F.3d 591 (4th Cir. 2011).[2] Specifically, the panel concluded that preliminary injunctive relief was warranted as to both statements in the Resolution.

The County requested rehearing *en banc* which the Fourth Circuit granted on August 15, 2012, thereby vacating the panel decision. *Centro Tepeyac v. Montgomery Cnty.*, Nos. 11-1314 (L), 11-1336, 2012 WL 7855860 (4th Cir. Aug. 15, 2012). Argument was heard December 6, 2012 and the court issued an opinion on July 3, 2013, holding that this court acted within its discretion to enjoin preliminarily only the second sentence of the Resolution. 722 F.3d 184 (4th Cir. 2013).[3] Since September 2012, the County has stipulated that it will not enforce the Resolution against

---

[2] This opinion was issued in conjunction with an opinion addressing a similar ordinance regulating pregnancy centers in Baltimore City. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 683 F.3d 539 (4th Cir. 2012). In that case, the Fourth Circuit panel upheld the district court's grant of summary judgment as to plaintiff.

[3] The Fourth Circuit granted rehearing *en banc* in *Center for Pregnancy Concerns*. Nos. 11-1111 (L), 11-1185, 2012 WL 7855859 (4th Cir. Aug. 15, 2012). The court also issued its opinion on July 3, 2013, reversing the district court, holding that it erred by entering a permanent injunction without allowing defendants discovery or adhering to the applicable summary judgment standard. 721 F.3d 264 (4th Cir. 2013).

Centro Tepeyac while this case remains pending.  (ECF Nos. 61 and 65).

On August 16, 2013, Plaintiff renewed the motion for summary judgment.  (ECF No. 68).  Defendants filed a supplemental opposition and counter moved for summary judgment on September 17, 2013.  (ECF No. 70).  Plaintiff replied on October 21, 2013 (ECF No. 71), and Defendants replied on November 15, 2013 (ECF No. 72).

## II.  Standard of Review

A court may enter summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

The moving party bears the burden of showing that there is no genuine issue as to any material fact.  However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *Celotex,* 477 U.S. at 322–23.  Therefore, on those issues on

which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if

there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (3$^d$ ed. 1998).

## III. Analysis

The parties have filed cross-motions for summary judgment as to all counts in the complaint. Their memoranda focus principally on Centro Tepeyac's First Amendment claim, with the parties vigorously disputing both the level of scrutiny applicable to the Resolution and whether the Resolution satisfies that level of scrutiny.

As an initial matter, the type of First Amendment challenge Plaintiff brings must be considered, as that will dictate which party bears the burden of proof and the scope of that burden. There are two types of challenges to the validity of a statute on First Amendment grounds: facial and as-applied.

> The difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry. Under a facial challenge, a plaintiff may sustain its burden in one of two ways. First, a plaintiff asserting a facial challenge "may demonstrate 'that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep.'" *Greater Balt. Ctr.*, 721 F.3d at 282 (alterations omitted) (*quoting United States v. Stevens*, 559 U.S. 460, 472 (2010)). Second, a plaintiff asserting a facial challenge may also prevail if he or she "show[s] that the law is 'overbroad

> because a substantial number of its
> applications are unconstitutional, judged in
> relation to the statute's plainly legitimate
> sweep.'" *Id.* (alterations omitted) (*quoting
> Stevens*, 559 U.S. at 472). Under either
> scenario, a court considering a facial
> challenge is to assess the constitutionality
> of the challenged law "without regard to its
> impact on the plaintiff asserting the facial
> challenge." *Educ. Media Co. at Virginia
> Tech, Inc. v. Swecker*, 602 F.3d 583, 588 (4th
> Cir. 2010). In contrast, an as-applied
> challenge is "based on a developed factual
> record and the application of a statute to a
> specific person[.]" *Richmond Med. Ctr. for
> Women v. Herring*, 570 F.3d 165, 172 (4th Cir.
> 2009) (en banc).

*Educ. Media Co. at Virginia Tech, Inc. v. Insley*, 731 F.3d 291,
298 n.5 (4th Cir. 2013) (alterations in original). "In an as-
applied challenge, . . . the state must justify the challenged
regulation with regard to its impact on the plaintiffs." *Id.* at
298. Thus, the type of challenge dictates what must be
demonstrated and who carries the burden of persuasion.

Plaintiff's amended complaint requests the court to
"[d]eclare the Resolution unconstitutional on its face and/or
as-applied to Plaintiff." (ECF No. 41, at 13). The motions are
not precise as to the grounds on which summary judgment is
sought. Plaintiff requests that the court "enter summary
judgment in Plaintiff's favor on all claims in the First Amended
Complaint." (ECF No. 48-1, at 58). Defendants request that the
court "[d]eny the Plaintiff all relief requested" and "[e]nter a
judgment in favor of the Defendants." (ECF No. 49, at 38).

Therefore, to prevail on summary judgment, Defendants must demonstrate that they are entitled to judgment that the Resolution is constitutional on its face *and* as-applied to Plaintiff. In the as-applied challenge, the burden falls on Defendants, while Plaintiff carries the burden to demonstrate facial unconstitutionality.

For purposes of issuing the preliminary injunction, the court elected to consider the Resolution's two statements separately. *Centro Tepeyac v. Montgomery Cnty.*, 779 F.Supp.2d 456, 470 (D.Md. 2011). That decision was affirmed by the Fourth Circuit, and separating out contested compelled statements has the support of at least one other court, *Evergreen Ass'n, Inc. v. City of N.Y.*, 740 F.3d 233 (2[d] Cir. 2014). Neither party addressed the issue of severability at the preliminary injunction stage and they continue not to discuss it here. Rather, they challenge or support the Resolution as an all or nothing proposition. Given the County's silence, and upon further consideration of the governmental interest articulated, the court will consider the Resolution's two statements as a single entity, to rise or fall together.

## A.   Strict Scrutiny Applies[4]

---

[4]   Plaintiff brings claims for violations of the First Amendment (Count I) and Article 40 of the Maryland Declaration of Rights (Count III). "Article 40 is read generally *in pari materia* with the First Amendment." *Nefedro v. Montgomery Cnty.*,

As noted in the court's prior opinion, the parties seem to agree that the Resolution requires Centro Tepeyac to say something that it would not otherwise say. The First Amendment, as applied to the states by the Fourteenth Amendment, protects not only "the right to speak freely," but also "the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). As a result, laws that compel speech are ordinarily considered "content-based regulation[s] of speech" subject to strict scrutiny because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). This court has previously concluded that strict scrutiny is appropriate in this case precisely because the Resolution compels non-commercial speech. *Centro Tepeyac*, 779 F.Supp.2d at 468.

The County requests that that analysis be revisited for three separate reasons: (1) compelled speech is not always held to strict scrutiny when the regulation is triggered by a characteristic of the speaker, as opposed to the content of his speech; (2) Centro Tepeyac is engaged in commercial speech; and (3) Centro Tepeyac is engaged in professional speech. According

414 Md. 585, 593 n.5 (2010). Therefore, it is not necessary to consider Plaintiff's Article 40 claim separately.

to Defendants, any of these reasons require the Resolution to be subject to intermediate scrutiny, at most. (ECF No. 49, at 22).

First, Defendants argue that the Resolution's definition of an LSPRC is tied to their acts, not the content of their speech. Application of the Resolution is triggered by the fact that an LSPRC (1) has a primary purpose of providing pregnancy-related services; (2) does not have a licensed medical professional on staff; and (3) provides information about pregnancy-related services. All of these characteristics are factual, divorced from the content of the LSPRC's speech.

Defendants are only two-thirds correct at best. The presence or absence of a licensed medical professional is a fact divorced from the content of LSPRC's speech. Although "pregnancy-related services" may be conduct (*e.g.*, administering pregnancy tests, providing maternity clothes), they may also not be (*e.g.*, counseling a pregnant woman to favor adoption over abortion). But providing information about pregnancy-related services is a message which triggers the Resolution's disclosure requirements, thereby exacting a content-based penalty. *See Riley*, 487 U.S. at 795 (solicitation of funds triggers requirement to express government-favored message).

Defendants' authorities to the contrary are not persuasive. *Turner Broadcasting v. F.C.C.*, 512 U.S. 622 (1994), upheld a federal law requiring cable operators to carry broadcast

stations and rejected the cable operators' argument that strict scrutiny was appropriate because they were being compelled to transmit speech not of their choosing. The Court distinguished cases like *Riley* because all cable operators were burdened regardless of the messages they conveyed. *Id.* at 655. In this case, however, only those entities that wish to speak about pregnancy-related services are forced to make the County-mandated disclosures, whereas entities that provide non-professional information about other health topics are not required to disclose. LSPRCs are targeted based on the content of their message. Accordingly, *Turner* is not controlling.

*National Federation of the Blind v. F.T.C.*, 420 F.3d 331 (4th Cir. 2005), another case Defendants cite, was decided in the context of charitable solicitations, an area of speech that occupies a middle ground between commercial and non-commercial speech, with correspondingly less protection than pure non-commercial speech. *Id.* at 338. Furthermore, the Fourth Circuit distinguished *Riley* solely in terms of the fact that the regulations at issue were more narrowly tailored than those in *Riley*. *Id.* at 344-45. Defendants' reliance on *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), and its progeny *Planned Parenthood v. Rounds*, 530 F.3d 724 (8th Cir. 2008), and *Summit Medical Ctr. of Ala., Inc. v. Riley*, 274 F.Supp.2d 1262 (M.D.Ala. 2003), is similarly misplaced. The Supreme Court of

the United States in *Casey* upheld the state's requirement that a physician provide specified information to a woman about the risks of abortion. While acknowledging that the physician's First Amendment rights not to speak are implicated, the Court held that the requirements were part of the practice of medicine, which is subject to the reasonable licensing and regulation by the state. 505 U.S. at 884. Here, by contrast, Plaintiffs are not abortion providers, nor regulated as medical practioners. To the extent that *Casey* and its progeny deal with professional speech, that doctrine's applicability will be addressed below.

This case is also not comparable to the situation in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006). There, the Supreme Court rejected the argument of a group of law schools that the Solomon Amendment requiring them to provide recruiting assistance to the military was a form of compelled speech, finding that the federal law was a regulation of conduct (provide the same access to military recruiters as to the non-military recruiter receiving the most favorable access) to which any compulsion of speech (*e.g.*, sending out a military recruitment email) was plainly incidental. The Court wrote that "[a]s a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do* – afford equal access to military

recruiters – not what they may or may not *say*." *Id.* at 60 (emphasis in original). The Resolution, however, does the exact opposite. To the extent it mandates conduct by forcing Centro Tepeyac to erect a sign in its waiting room, that conduct is incidental to the regulation's speech command. Consequently, the Resolution is a regulation of speech.

Finally, Defendants in their supplemental opposition brief cite to the recent Fourth Circuit case, *Maryland v. Universal Elections, Inc.*, 729 F.3d 370 (4th Cir. 2013), which considered a challenge to the Telephone Consumer Protection Act, a law that required all automated, prerecorded messages to identify the entity sponsoring the phone call and provide that entity's telephone number, 47 U.S.C. § 227(d)(1), (3)(A); 47 C.F.R. § 64.1200(b). The court considered the identity disclosure requirement to be a content-neutral regulation because it applies regardless of the content of the message that is relayed to the recipient, placing no greater restriction on a particular group of people or form of speech, and not burdening appellants more than any other person or group placing robocalls. 729 F.3d at 376. The Resolution at issue here, by contrast, applies precisely *because* the content of Plaintiff's message is pregnancy-related services.

In sum, Defendants' arguments to the contrary are unpersuasive and the Resolution is a content-based speech restriction.

Content-based regulations are typically subject to strict scrutiny, but can be subject to lesser scrutiny in certain circumstances. Defendants contend that two of those exceptions apply here: commercial speech and professional speech.

The court previously considered the commercial speech issue in the context of Plaintiff's motion for a preliminary injunction, analyzing whether the speech "propose[s] a commercial transaction," *Bd. of Tr. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473 (1989), or, alternatively, whether it was "expression related solely to the economic interests of the speaker and its audience," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). The court concluded that Centro Tepeyac's speech was non-commercial as it provides its services free of charge, which by definition could not be a commercial transaction. Additionally, there was no indication that Centro Tepeyac was acting out of economic interest, but rather was allegedly motivated by social concerns. *Centro Tepeyac*, 779 F.Supp.2d at 463-64. The two other district courts to consider the applicability of the commercial speech doctrine to LSPRCs used the same "economic interests" and "commercial transaction" definitions of commercial speech, and

found that the plaintiffs did not engage in commercial speech because they provided their services free of charge not for economic reasons, but in furtherance of their social views. *See Evergreen Assn'n, Inc. v. City of N.Y.*, 801 F.Supp.2d 197, 205 (S.D.N.Y. 2011); *O'Brien v. Mayor and City Council of Balt.*, 768 F.Supp.2d 804, 813 (D.Md. 2011).

In considering Baltimore's LSPRC regulations, the Fourth Circuit, sitting *en banc*, indicated that this definition of commercial speech was too restrictive and laid out the doctrine's parameters:

> The analysis [of whether speech is commercial] is fact-driven, due to the inherent "difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993). On one occasion, in *Central Hudson Gas & Electric v. Public Service Commission of New York*, the Supreme Court defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." 447 U.S. 557, 561 (1980). But the Court has noted that commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405 (2001); *see also Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989) (pronouncing "propose a commercial transaction" to be "*the* test for identifying commercial speech" (emphasis added)). The Court has also described the proposal of a commercial transaction – e.g., "I will sell you the X prescription drug at the Y price," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 761 (1976) –

as "the core notion of commercial speech."
*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S.
60, 66 (1983).

. . .

   [E]ven where speech "cannot be
characterized merely as proposals to engage
in commercial transactions," the speech may
yet be deemed commercial; in that event,
"proper classification as commercial or
noncommercial speech . . . presents a closer
question." *Bolger*, 463 U.S. at 66; *see also*
*Adventure Commc'ns, Inc. v. Ky. Registry of
Election Fin.*, 191 F.3d 429, 440 (4th Cir.
1999) ("In the abstract, the definition of
commercial speech appears to be fairly
straightforward, if somewhat circular: it is
speech that proposes a commercial
transaction. In practice, however,
application of this definition is not always
a simple matter." (citations and internal
quotation marks omitted)). From *Bolger*,
courts of appeals have gleaned "three
factors to consider in deciding whether
speech is commercial: (1) is the speech an
advertisement; (2) does the speech refer to
a specific product or service; and (3) does
the speaker have an economic motivation for
the speech." *U.S. Healthcare, Inc. v. Blue
Cross of Greater Phila.*, 898 F.2d 914, 933
(3d Cir. 1990) (citing *Bolger*, 463 U.S. at
66-67); *accord, e.g., Spirit Airlines, Inc.
v. U.S. Dep't of Transp.*, 687 F.3d 403, 412
(D.C. Cir. 2012); *United States v. Benson*,
561 F.3d 718, 725 (7th Cir. 2009); *Adventure
Commc'ns*, 191 F.3d at 440-41. While "[t]he
combination of *all* of these characteristics
. . . provides strong support for the . . .
conclusion that [speech is] properly
characterized as commercial speech," *Bolger*,
463 U.S. at 67, it is not necessary that
each of the characteristics "be present in
order for speech to be commercial," *id.* at
67 n.14.

*Greater Balt. Ctr.*, 721 F.3d at 284-85 (first and second alterations added).

Defendants, in their supplemental opposition, argue that the commercial speech doctrine applies even though Centro Tepeyac does not propose a commercial transaction, citing to *Greater Baltimore Center*'s recognition of the three factors from *Bolger*: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech. 721 F.3d at 285. Defendants insist that the record developed since the court's prior opinion demonstrates that Centro Tepeyac is acting out of an economic interest because a few of the women to whom it provides services have subsequently made donations to the organization (ECF No. 49, at 26; ECF No. 72 at 2), and the organization's website "openly solicits money from all of its customers on its website, which contains convenient links to 'Visa' and 'PayPal.'" (ECF No. 72, at 2).

This argument strains the record and must be rejected. The record indisputably indicates that Centro Tepeyac provides its services entirely free of charge and that, in "rare" circumstances, some women have later donated to its cause. (ECF No. 49-4, at 22-23, 43, Trans. 22:16 – 23:2, 43:14-24). The infrequent receipt of unsolicited donations from women who have previously visited Centro Tepeyac and the placement of links on

Centro Tepeyac's website to donate does not, as the County contends, prove that Centro Tepeyac offers pregnancy-related services in furtherance of their economic interests. *Cf. Evergreen Assoc., Inc. v. City of N.Y.*, 801 F.Supp.2d 197, 206 n.5 (S.D.N.Y. 2011) (if the LSPRC were "referring women to pro-life doctors in exchange for 'charitable' contributions, the analysis could change.").

But the absence of a speaker's economic motive is not dispositive, as the Fourth Circuit in *Greater Baltimore Center* went on to state that "even *Bolger* does not preclude classification of speech as commercial in the absence of the speaker's economic motivation. *See* 463 U.S. at 67 n.14." 721 F.3d at 285-86. The district court was instructed to go beyond evaluating the pregnancy center's speech against the "core" definitions of commercial speech (*i.e.*, commercial transaction or economic motive), and engage in a more contextual analysis, considering both speaker and listener:

> Because the Ordinance compels a disclaimer, the "lodestars in deciding what level of scrutiny to apply . . . must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Riley*, 487 U.S. at 796. In other words, context matters. From a First Amendment free speech perspective, that context includes the viewpoint of the listener, for "[c]ommercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible

> dissemination of information." *See Cent.
> Hudson*, 447 U.S. at 561-62; *see also Va.
> State Bd. of Pharmacy*, 425 U.S. at 756
> ("Freedom of speech presupposes a willing
> speaker. But where a speaker exists . . .
> the protection afforded is to the
> communication, to its source and to its
> recipients both." (footnote omitted)).

721 F.3d at 286 (alteration in original).

As an example of a case that employed the proper analysis, the Fourth Circuit pointed to *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176, a 1986 case from the Supreme Court of North Dakota. In *Larson*, plaintiff was an abortion provider that brought an action under the state's false advertising law against an anti-abortion clinic. The anti-abortion clinic had taken a name very similar to the abortion clinic's and put advertisements in newspapers strongly suggesting that it performs abortions and provides financial assistance for such services. Plaintiff alleged that the anti-abortion clinic lured pregnant women to the clinic unwittingly to receive anti-abortion propaganda. The trial court entered a preliminary injunction against the defendant who in turn argued to the state Supreme Court that such an injunction constituted an unconstitutional prior restraint.

The state Supreme Court rejected defendant's argument, finding that the advertisements were commercial speech. Defendant argued that its communications were not commercial

speech because no financial charges are assessed against persons receiving services from the clinic. The state Supreme Court was skeptical of this assertion because the advertisements expressly stated that financial assistance was available and that major credit cards are accepted. The court found that contested issue irrelevant though, as it held that the monies received by defendant were not dispositive of the determination that the communication involved is commercial speech.

> More importantly, [defendant's] advertisements are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas. [Defendant's] advertisements offer medical and advisory services in addition to financial assistance. In effect, [defendant's] advertisements constitute promotional advertising of services through which patronage of the clinic is solicited, and in that respect constitute classic examples of commercial speech.

381 N.W.2d at 181.

Defendants contend that the first and second of the *Bolger* factors are present here, namely Plaintiff's provision of products and services (*e.g.*, pregnancy testing, medical advice and diapers) and its placement of advertisements that solicit customers. (ECF No. 70, at 5). As evidence of Plaintiff's advertisements, Defendants point to two screenshots of Centro Tepeyac's website placed in the record. The first states that Centro Tepeyac offers

- Facts on the risks and effects of abortion
- FREE Pregnancy Test
- Bilingual advice
- Ongoing support, during pregnancy, childbirth and after birth; with parents, boyfriend or husband, as needed
- Prenatal & Parenting Classes, support groups and child-care programs
- Maternity and baby clothing, furniture and supplies
- Post abortion counseling & peer support
- Instruction in natural family planning

(ECF No. 49-7). The second screenshot is from a page entitled "About Centro Tepeyac" and states that it "provides pregnancy testing, referral services, confidential counseling, sexual integrity education, parenting information and post-abortion guidance. All services are free and confidential and available in Spanish and English." (*Id.*). Both webpages provide links to donate, but also state that "All Services are provided FREE of charge." (*Id.*). From this, Defendants argue that Centro Tepeyac is (1) advertising, (2) for specific products or services. According to Defendants, the presence of two of the three *Bolger* factors makes Plaintiff's speech commercial for which intermediate scrutiny applies.

The evidence in the record does not support Defendants' arguments as to Plaintiff. *Larson* concerned an anti-abortion clinic's advertisements for services. The North Dakota Supreme Court held that the clinic's advertisements were commercial speech - even if it had no economic motivations – because it was

going into the marketplace, advertising valuable services such as pregnancy tests as an attempt to get pregnant women to patronize its clinic as opposed to the other facilities in the area. For pregnant women – the listeners of this speech - the pregnancy services have value and the fact that the anti-abortion clinic was offering them for free made it more attractive than its competitors. The North Dakota Supreme Court seemed to be motivated by the reality that the anti-abortion clinic's advertisements were in all practical respects indistinguishable from those of the for-profit clinics. Inasmuch as the for-profit clinic's advertisements were clearly commercial speech it was proper to consider the anti-abortion clinic's speech also commercial and evaluate any regulations against its more permissive standard.

Here, unlike the advertisements in *Larson*, the speech being regulated takes place within an LSPRC's waiting room, not amongst the general discourse between and among pregnancy-service providers and pregnant women, but within Centro Tepeyac's four walls, much closer to their ideological message. There is nothing in the record indicating that Centro Tepeyac is advertising its provision of services in its waiting room; the record includes only screenshots from its website. Nor does the record contain evidence that Centro Tepeyac's physical facility advertises its services to passers-by whereby a pregnant woman

would want to know the qualifications of those providing these services. Plaintiff advertises its services on its website, which could be considered commercial speech. From that, Defendants incorrectly attempt to extrapolate that it can regulate all of Plaintiff's speech as commercial speech, including that within its waiting room. But as the Fourth Circuit stated: "context matters." *Greater Balt. Ctr.*, 721 F.3d at 286. Defendants' arguments and the record do not demonstrate that a website advertising services out to the world is equivalent to a center's waiting room where there is no indication that advertisements take place and it is undisputed that Centro Tepeyac does not charge for its services.[5] Even under the broader, contextual analysis of commercial speech, the evidence in the record does not demonstrate that the Resolution regulates Plaintiff's commercial speech.

---

[5] The County's contention that Centro Tepeyac has conceded that it engages in commerce is similarly unavailing. According to the County, Centro Tepeyac's assertion that the County could address the concerns motivating the Resolution through the use of antifraud laws is an implicit concession that Centro Tepeyac is a commercial actor. This contention, however, misunderstands the nature of Centro Tepeyac's argument. A close reading of Centro Tepeyac's motion papers reveals that it discussed the "use or *amend[ment]*" of these laws merely to illustrate one way in which the County could lawfully address its concerns. (ECF No. 48-1, at 44) (emphasis added). At no point did Centro Tepeyac ever concede that it had engaged in commerce and that its speech was commercial in nature.

The County also attempts to show that the Resolution is subject to a "lesser degree" of scrutiny because it implicates the professional speech doctrine. (ECF No. 49, at 25-26). Citing Justice White's concurrence in *Lowe v. SEC*, 472 U.S. 181 (1985), this court has previously explained that "professional speech occurs when a party offers individualized advice that engenders a relationship of trust with a client." (ECF No. 26, at 20).

> One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession. . . . Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such.

*Lowe*, 472 U.S. at 232 (White, J., concurring).

Justice White's concurring opinion in *Lowe* built upon the concurrence of Justice Jackson in *Thomas v. Collins*, 323 U.S. 516, 544-45 (1945). In that concurrence, Justice Jackson recognized a difference between individualized, professional speech and generalized speech related to traditionally "professional" subject matter:

[A] rough distinction always exists, I
think, which is more shortly illustrated
than explained. A state may forbid one
without its license to practice law as a
vocation, but I think it could not stop an
unlicensed person from making a speech about
the rights of man or the rights of labor, or
any other kind of right, including
recommending that his hearers organize to
support his views. Likewise, the state may
prohibit the pursuit of medicine as an
occupation without its license, but I do not
think it could make it a crime publicly or
privately to speak urging persons to follow
or reject any school of medical thought.

. . .

This wider range of power over pursuit of a
calling than over speech-making is due to
the different effects which the two have on
interests which the state is empowered to
protect. The modern state owes and attempts
to perform a duty to protect the public from
those who seek for one purpose or another to
obtain its money. When one does so through
the practice of a calling, the state may
have an interest in shielding the public
against the untrustworthy, the incompetent,
or the irresponsible, or against
unauthorized representation of agency.

323 U.S. at 544-45.

Based on these "instructive" concurring opinions, the court

previously concluded as follows:

The complaint could be read to allege that
[Centro Tepeyac] merely provides information
to women, who are then left to decide on
their own whether and how to use [Centro
Tepeyac]'s pregnancy-related information.
This mere provision of information would not
seem to be enough to create the type of
quasi-fiduciary relationship contemplated by
the [Court]. Not every offering of advice

> or information creates a relationship of
> trust. Otherwise, the distinction
> illustrated in *Lowe* and *Thomas* between
> discussion of professional subject matter
> and practice of a profession would be
> rendered meaningless.

779 F.Supp.2d at 467.

The County contends that the record now "debunks the notion that [Centro Tepeyac]'s counseling sessions just involve a couple of folks discussing pregnancy in a casual setting." (ECF No. 49, at 25). Specifically, it emphasizes that Centro Tepeyac has admitted promising confidentiality to the women it counsels and taking steps to ensure that such confidentiality is maintained, and it asserts that these facts render Centro Tepeyac's speech professional in nature.

Once again, the County reaches too far. The mere fact that Centro Tepeyac provides its program participants with the promise of confidentiality does not transform its message into professional speech. The County has offered no evidence that Centro Tepeyac does anything other than provide pregnancy-related information to these women. Indeed, the record is devoid of any indication that Centro Tepeyac "purports to exercise judgment on behalf of" its program participants, a critical component of professional speech. *Lowe*, 472 U.S. at 232 (White, J., concurring); *Evergreen Ass'n*, 801 F.Supp.2d at 207 ("While Plaintiffs meet with clients individually, there is

no indication that they employ any specialized expertise or professional judgment in service of their clients' individual needs and circumstances.").[6] At bottom, the County seeks to blur – and perhaps eliminate – the distinction between discussion of professional subject matter and the practice of a profession. Such an outcome would represent a breathtaking expansion of the narrow professional speech doctrine and would ensnare countless charitable organizations based solely on their provision of information to program participants in a private setting. Accordingly, in evaluating whether the Resolution violates Centro Tepeyac's First Amendment rights, strict scrutiny will be applied.[7]

**B.   Plaintiff Has Not Made a Sufficient Demonstration that Lesser Scrutiny Does Not Apply to other LSPRCs**

As discussed above, in a First Amendment challenge, which party carries the burden turns on whether the challenge is facial or as-applied.  Plaintiff requests a declaratory judgment

---

[6] The County also presents no evidence indicating that Centro Tepeyac's employees have engaged in the practice of any regulated profession. *See Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 603-04 (4th Cir. 1988) (noting that "governmental regulation of the professions is constitutional if the regulations have a rational connection with the applicant's fitness or capacity to practice the profession" (internal quotation marks omitted)).

[7] Strict scrutiny is appropriate because the Resolution compels Centro Tepeyac to speak a particular message; thus, the parties' remaining arguments about strict scrutiny's applicability need not be resolved here.

that the Resolution is unconstitutional either on its face or as-applied to Plaintiff.  In a facial challenge, Plaintiff bears the burden of demonstrating "that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep," or "that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Greater Balt. Ctr.*, 721 F.3d at 282 (alterations and quotation marks omitted).

Dr. Tillman stated that there are presently two LSPRCs in Montgomery County: Birthright and Centro Tepeyac.  Little has been submitted about Birthright.  Ms. Carole Buchanan, Birthright's Executive Director, told the County Council that it is an incorporated 501(c)(3) charity that does not charge for its services, much like Centro Tepeyac.  (ECF No. 48-6, at 60). There is no evidence in the record, however, as to the nature of the counseling or how it solicits services.  As illustrated in the preceding sections, such information is critical in assessing whether the commercial or professional speech doctrines apply to a speaker.  Depending on the nature of Birthright's activities, a lesser standard of review – either rational basis or intermediate scrutiny – would apply to the Resolution. *See Casey*, 505 U.S. at 884 (upholding a requirement that doctors disclose truthful, nonmisleading information to

patients about certain risks of abortion); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) (applying rational basis standard to laws requiring individuals to disclose "purely factual and uncontroversial information about the terms under which [their] services will be available"); *Central Hudson*, 447 U.S. at 566 (regulations on nonmisleading commercial speech regarding lawful activity must withstand intermediate scrutiny). The Fourth Circuit has instructed district courts that it is improper on a facial challenge to assume that the characteristics of one LSPRC for which there is evidence in the record reflects the characteristics of all LSPRCs within the regulation's sweep because it is not possible to "properly evaluate the [Resolution's] validity in all or most of its applications without evidence concerning the distinctive characteristics" of the various LSPRCs in Montgomery County. *Greater Balt. Ctr.*, 721 F.3d at 282. A regulation subject to rational or intermediate review may still fail, but Plaintiff has not made that argument. Accordingly, it has failed to carry its burden of demonstrating the Resolution is unconstitutional on its face.

**C.  Defendants Have Failed to Demonstrate that the Resolution Passes the Strict Scrutiny Test**

The analysis now turns to whether the County has met its burden of demonstrating that the Resolution survives strict

scrutiny as applied to Plaintiff.  To do so, it must demonstrate that the Resolution is narrowly tailored to promote a compelling government interest.  *PSINet, Inc. v. Chapman*, 362 F.3d 227, 233 (4th Cir. 2004).

The Resolution itself states the government's interest that spurred its passage: the Board's concern "that clients may be misled into believing that a Center is providing medical services when it is not. . . .  Clients could therefore neglect to take action (such as consulting a doctor) that would protect their health or prevent adverse consequences, including disease, to the client or the pregnancy."  (ECF No. 48-5, at 1).  In this litigation, Defendants have characterized the interest as "protecting the health of pregnant women," (ECF No. 49, at 28), and "protecting the health of women and in ensuring that women are not duped into believing that they are receiving medical advice from a licensed medical provider." (ECF No. 70, at 6).

Courts have occasionally assumed, sometimes without deciding, that protecting the health of its citizens is, at least in some instances, a compelling interest.  *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 310 (1978) ("It may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification."); *Loxley v. Chesapeake Hosp. Auth.*, 166 F.3d 333, 1998 WL 827285,

at *4 (4th Cir. 1998) (table decision) (evaluating the competence of medical personnel involves the "overriding and compelling state interest in safeguarding and protecting [] health, safety, and lives" (internal quotation omitted, alteration in original)); *Buchwald v. Univ of N.M. Sch. of Med.*, 159 F.3d 487, 498 (10th Cir. 1998) (citing *Bakke* to conclude that "public health is a compelling interest"); *Varandani v. Bowen*, 824 F.2d 307, 311 (4th Cir. 1987) (observing, in Due Process context, that government has "compelling interest in assuring safe health care for the public"); *Mead v. Holder*, 766 F.Supp.2d 16, 43 (D.D.C. 2011) ("[T]he Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets."); *Dickerson v. Stuart*, 877 F.Supp. 1556, 1559 (M.D.Fla. 1995) ("The State of Florida has a compelling interest in the health of expectant mothers and the safe delivery of newborn babies.").

For the purposes of this opinion, it will be assumed that Defendants have identified a compelling interest in safeguarding the health of pregnant women.

The mere identification of a valid compelling interest is not sufficient, however: the restriction on speech must also actually further that interest. As the Supreme Court recently stated, "[t]he State must specifically identify an 'actual problem' in need of solving and the curtailment of free speech

39

must be actually necessary to the solution." *Brown v. Entm't Merchants Ass'n*, 131 S.Ct. 2729, 2738 (2011) (*citing United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822-23 (2000); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395 (1992)). Defendants "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the [Resolution] will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664 (quotation marks and citation omitted); *see also Watchtower Bible, Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 169 (2002) (rejecting government's asserted general interest of crime prevention in part because "there is an absence of any evidence of a special crime problem related to [the challenged discriminatory law] in the record before us."); *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest."); *Gilardi v. U.S. Dep't of Health and Human Servs.*, 733 F.3d 1209, 1220 (D.C. Cir. 2013) ("'safeguarding the public health' is such a capacious formula that it requires close scrutiny of the asserted harm."); *Greater Balt. Ctr.*, 721 F.3d at 288 (reversing the district court grant of summary judgment because defendant "must be accorded the opportunity to develop evidence relevant to the compelling

governmental interest . . . including, *inter alia*, evidence substantiating the efficacy of the Ordinance in promoting public health."); *Awad v. Ziriax*, 670 F.3d 1111, 1130 (10th Cir. 2012) (rejecting Oklahoma constitutional amendment that forbid courts from considering or using international law or Sharia law because the state failed to identify any "actual problem the challenged amendment seeks to solve" as the state "did not know of even a single instance where an Oklahoma court had applied Sharia law or used the legal precepts of other nations or culture, let alone that such applications or uses had resulted in concrete problems in Oklahoma."). It is a demanding standard. "It is rare that a regulation restricting speech because of its content will ever be permissible." *Playboy*, 529 U.S. at 818.

The County Council phrased the public health concerns in terms of possibilities: pregnant women *may* mistake an LSPRC for a medical clinic or its staff members as licensed medical professionals and, because of that erroneous belief, *could* fail to consult an actual medical professional, leading to negative health outcomes. (ECF No. 49, at 18). The parties dispute at which stage of the logic chain Defendants need to show that the harm is real and that the Resolution will actually alleviate these harms. *See Turner*, 512 U.S. at 664. Defendants appear to argue that it is sufficient to have evidence before the Council

41

demonstrating that LSPRCs give out medical advice (as a medical clinic would) and appear to an uninformed observer to be a medical clinic. Defendants then argue that the existence of those findings in the legislative record permit the conclusion that harm would result, namely pregnant women foregoing medical care. Plaintiff, however, insists that Defendants must go further: it is not enough to posit that LSPRCs appear to be medical clinics and are giving out incorrect medical advice; Defendants must show that LSPRCs are *actually* presenting themselves as medical clinics, that women are *actually* confused as to status of an LSPRC or the credentials of its staff, or have *actually* failed to obtain medical advice because of that erroneous belief. Plaintiff contends that the legislative record and Dr. Ullman's testimony demonstrate no such problem. Essentially, Plaintiff argues that the Resolution is a solution in search of a problem, a condition that does not justify compelled speech.

The record before the County Council has several documents relevant to this issue. First, the Waxman Report states as its aim to "examine[] the scientific accuracy of the information provided by . . . federally funded 'pregnancy resource centers.'" (ECF No. 48-6, at 15). The report wrote that LSPRCs "are virtually always pro-life organizations" who "often mask their pro-life mission in order to attract 'abortion vulnerable

clients'" by advertising that it "will provide pregnant teenagers and women with an understanding of all of their options." (*Id.* at 17-18). The investigators, posing as seventeen-year old pregnant girls seeking an abortion, found that they often received false or misleading information concerning the purported relationship between abortion and (1) breast cancer, (2) infertility, and (3) mental illness. In its conclusion, the report stated that this misinformation "may be effective in frightening pregnant teenagers and women and discouraging abortion. But it denies the teenagers and women vital health information, prevents them from making an informed decision, and is not an accepted public health practice." (*Id.* at 30). The second document that was part of the legislative record was the NARAL Report. First focusing on LSPRC practices generally, the report wrote that LSPRCs provide false and misleading information about abortion, "rarely supply information on contraception, and will not give referrals to clinics or physicians that offer comprehensive reproductive health care." (*Id.* at 33). LSPRCs target young, poor, and minority women by advertising in college newspapers and offering free services, some of which can be costly in the private sector. Turning next to an investigation of LSPRCs in Maryland, the report found that every center visited provided misleading or completely false information, "a systematic pattern of

deception intended to prevent women from making informed decisions about their reproductive health." (*Id.* at 34). According to the report, LSPRCs used the provision of medical services such as pregnancy tests and sonograms as "delay tactics to deter and prevent women from exercising their right to choose," while also "gaining a sense of authority and credibility in their client's eyes as a medical service provider." (*Id.* at 38).

The County Council also had before it numerous comments in favor of and against the Resolution. Ms. Nellie Beckett, a then-senior at Montgomery Blair High School visited two LSPRCs in Montgomery County – including Centro Tepeyac - as part of her work volunteering for NARAL. She called Centro Tepeyac and was told that they provide free sonograms, pregnancy tests, and counseling on the consequences of abortion. She reported that some of the information she was told seemed medical, such as abortion can affect future fertility. Only when she specifically asked for a referral did the Centro Tepeyac volunteer inform her that the center did not refer for abortions. Additionally, the Centro Tepeyac volunteer only acknowledged that its staff were not doctors after several direct questions. (ECF No. 48-6, at 47).

Ms. Amy Peyrot was also a volunteer at NARAL. She reported visiting two LSPRCs in Montgomery County, where she was told

44

incorrect information about the health effects of abortion. The counselors at Birthright stated that they were not a medical facility, but only after she inquired about contraceptives and whether she would meet with a doctor or a nurse. She reported that the second LSPRC (Shady Grove Pregnancy Center) "had a reception window, waiting room, and hallways that looked very similar to a doctor's office." (*Id.* at 48). Ms. Peyrot was only told that the LSPRC was not a medical facility when she asked directly who she would meet with and when she inquired about birth control.

Ms. Eleanor Dayhoff-Brannigan was a law student who wrote about her experience at Centro Tepeyac as a volunteer investigator for NARAL. She reported that the Centro Tepeyac volunteer asked her a series of medical questions, "including whether I was experiencing any pregnancy symptoms, the date of my last menstrual cycle, and whether I was using any form of birth control." (*Id.* at 50). She reported being told incorrect information about the health effects of birth control, the efficacy of condoms, and was encouraged to engage in natural family planning instead. She stated that these pregnancy centers were deliberately appearing like medical facilities but did not elaborate as to what she was basing this view upon.

Finally, Ms. Laura Berger submitted comments concerning her experience at Birthright as a volunteer investigator for NARAL.

She was told inaccurate information about abortions and birth control and was never informed that the center was not a medical facility. She went on to state that "[b]ased on the medical information and services being provided, I think it is easy for a woman or teen to misinterpret this center as a medical facility." (*Id.* at 52).

Comments were also submitted in opposition. Ms. Jacqueline Stippich, Executive Director of Shady Grove Pregnancy Center, stated that they receive forty-three percent (43%) of their clients from their advertisements, where they are listed under "Abortion Alternatives" in the telephone book. They opened in 1983 and have served over 30,000 women "without ever receiving a formal complaint for giving inaccurate information or misrepresenting our services." (*Id.* at 55). She stated that their website has four disclaimers, including one that states "we are not an abortion provider." Notably, their client intake sheet states that the center is "not a medical facility . . . and a positive test result should be verified by a physician's examination." When queried over the telephone about abortion, they state that they "are not an abortion provider, we are a pregnancy center." (*Id.* at 56).

Ms. Vera of Centro Tepeyac submitted comments and stated that at least half of the women who come in for a pregnancy test are referred to them by the public clinics in Montgomery County.

She attached their pregnancy test form which states – in English and Spanish – that the test result is "not a diagnosis. The person to make a diagnosis is your physician. We recommend you contact your doctor as soon as possible." (*Id.* at 59).

Finally, Ms. Carole Buchanan, the Executive Director of Birthright, told the County Council that the center was established in 1970 and in the last ten years helped over 37,000 women. In their thirty-nine years of existence they have not received a single client complaint. They advertise in the telephone book under "Abortion Alternatives." A woman calling about an abortion is immediately told "we are not a medical facility nor do we refer for abortions." They help women "by listening to [their] fears and concerns and we tell [them] what we can offer [them]. We never give medical advice." (*Id.* at 60).

During discovery, Dr. Ulder Tillman was deposed as the County's Rule 30(b)(6) representative. She testified that there are two LSPRCs in Montgomery County: Centro Tepeyac and Birthright. She has been the County's Chief of Public Health since 2003 and in that time she has not received one complaint from someone who sought service at either Centro Tepeyac or Birthright. (ECF No. 48-10, at 14, Trans. 14:10-14). She had not received any evidence that any actual pregnant women who went to an LSPRC delayed seeking medical care. (*Id.* at 25-26,

Trans. 24:24 – 25:6).  Dr. Tillman had no idea whether women who go to an LSPRC do not also end up going to a medical provider. (*Id.* at 62, Trans. 62:7-10).

Ms. Vera testified that confusion about the status of Centro Tepeyac is rare and mostly from those that call the center.  She said that once they detect any confusion they make it clear that they are not a medical facility and if the woman has medical issues she needs to see a doctor.  Once at the center, there is nothing to suggest it is a medical facility as the walls are bright colors and are not populated by things seen in a medical facility.  They attempt to foster a "homey" feeling.  If asked, they would state it is not a licensed medical facility, but they do not immediately volunteer it because they want to focus on their positive aspects.  (ECF No. 49-5, at 26-29, Trans. 26:8 – 29:7).

Defendants also draw attention to two pieces of evidence in the legislative record compiled by Baltimore City as recounted in *Greater Baltimore Center*.  First, Ms. Tori McReynolds submitted written testimony that sixteen years ago, when she was sixteen years old, she went to get a pregnancy test at an LSPRC listed in the phone book under "Abortion Counseling."  While waiting for the results of her pregnancy test, a woman at the LSPRC subjected McReynolds to anti-abortion propaganda.  She stated that she "felt tricked. . . .  Had my mother and I seen a

48

sign at that reception desk informing us that we could not get referrals for abortion or birth control, we would have simply moved on." 721 F.3d at 275. Second, Dr. Jodi Kelber-Kaye of the University of Maryland, Baltimore County submitted written testimony to the City Council stated that she has heard "countless stories" from her students "who go to [LSPRCs], assuming they will get a full range of services and counseling and wind up feeling harassed, coerced, and misinformed." *Id.* Dr. Kelber-Kaye was "distressed by the existence of centers that, on purpose, appear to be medical facilities and are not staffed by licensed medical personnel, nor even licensed counselors." *Id.* Defendants point to this evidence as "still more facts proving that the County's concerns are real." (ECF No. 70, at 6).[8]

Both parties have brought motions for summary judgment. Consequently, the evidence must be viewed in the light most favorable to each party when considering its opponent's motion. Given that the burden under strict scrutiny rests with

---

[8] Such evidence – coming outside the legislative record – is permitted if it is used to "explain the state interests behind challenged regulations" as opposed to a situation "where there is no evidence in the pre-enactment legislative record." *Greater Balt. Ctr.*, 721 F.3d at 282 (*quoting 11126 Balt. Blvd. v. Prince George's Cnty., Md.*, 886 F.2d 1415, 1425 (4th Cir. 1989), *vacated on other grounds*, 496 U.S. 901 (1990)). This evidence will be permitted as is it helps to explain the County's interest behind the Resolution, specifically that pregnant women be fully informed.

Defendants, it is sensible to examine Plaintiff's motion first, when all evidence will be viewed in the light most favorable to the County and it is its responsibility to confront the motion with evidence showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 322-23.

Defendants – in resisting Plaintiff's motion – have pointed to the Waxman and NARAL reports and the various statements submitted to the County Council and the Baltimore City Council as evidence that there is an actual problem of LSPRCs presenting themselves as medical clinics such that a woman ignorant of their true status would think the advice she had received was medical advice. Consequently, she would forego actual medical advice to the detriment of her health.

The record produced by Defendants is simply insufficient to sustain this regulation of Plaintiff's First Amendment rights. Assuming *arguendo* that the County has a compelling interest in positive health outcomes for pregnant women, the critical flaw for the County is the lack of any evidence that the practices of LSPRCs are causing pregnant women to be misinformed which is negatively affecting their health. It does not necessarily follow that misinformation will lead to negative health outcomes. The County attempts to elide this distinction by providing no evidence for the effect, only the alleged cause. The Waxman and NARAL reports focus on the misinformation

problem.  So too do all of the comments made to the County Council in support of the Resolution.  These commenters – who were universally volunteers from a pro-choice organization sent to investigate LSPRCs' practices – discussed the alleged misinformation they were provided and that that the LSPRCs were not forthcoming with the fact that they are not a medical center and that they do not provide referrals for abortions.  But even assuming all that is true – that LSPRC are presenting themselves as medical providers and thus pregnant women are accepting their misinformation as sound medical advice, the County must still demonstrate the next supposition on the logical chain: that these practices are having the effect of harming the health of pregnant women.  The County has failed this task.  The NARAL volunteers did not forego medical care because of the LSPRCs; they were merely testing the system as part of an investigation. Dr. Tillman, the County's Health Officer and Rule 30(b)(6) expert, testified that she never received one complaint about LSPRCs in the eight years she had been the County's Chief of Public Health nor had any evidence that an actual pregnant women – as opposed to a NARAL volunteer – delayed seeking medical care after patronizing an LSPRC.  Similarly, the two pieces of evidence from the Baltimore case are unavailing.  Ms. McReynolds expressed frustration at being tricked as to the credentials of the LSPRC she visited, but does not indicate that the time she

wasted there led to any negative health outcomes. Dr. Kelber-Kaye's testimony recounted her many students who went to an LSPRC thinking they were going to receive the full panoply of services and counseling and instead wound up "feeling harassed, coerced, and misinformed." But even then, there is no evidence that those women failed to get the medical services and counseling they desired or that the time spent at the LSPRC was to the detriment of their health. Quite simply, the County has put no evidence into the record to demonstrate that LSPRCs' failure clearly to state that no doctors are on premises has led to any negative health outcomes.[9]

The parallels between this case and the Supreme Court's violent video game case – *Entertainment Merchants Association* – are striking. That case involved a California law that restricted the sale or rental of violent video games to minors. The Court, reviewing the law under strict scrutiny, struck down the law because California's evidence – a psychological study – did not "prove that violent video games *cause* minors to *act* aggressively," instead showing only a slight correlation. 131 S.Ct. at 2739 (emphasis in original). The Court acknowledged that the law's ends – reducing harm to minors – is legitimate, but held that that alone is not sufficient; the state must come

---

[9] In contrast, the record in *Evergreen Ass'n*, 740 F.3d at 239-41, contains the type of evidence lacking in this case.

forth with compelling evidence that the alleged evil is causing the alleged harm. The state "bears the risk of uncertainty, ambiguous proof will not suffice." *Id.* (citation omitted).

In this case, protecting the health of pregnant women is a legitimate goal for the County, just as protecting minors from engaging in violence is a worthy goal. Intuitively, perhaps, an LSPRC that does not tell a patron that staff members are not doctors and that the patron should seek a doctor might result in a delay in seeking medical treatment, just as the availability of violent video games to minors might lead to violence by minors. But as with California's violent video game law, when core First Amendment interests are implicated, mere intuition is not sufficient. Yet that is all the County has brought forth: intuition and suppositions. "This is not to suggest that a 10,000-page record must be compiled in every case or that the [g]overnment must delay in acting to address a real problem; *but the [g]overnment must present more than anecdote and supposition.*" *Playboy*, 529 U.S. at 822 (emphasis added); *see also Turner*, 512 U.S. at 664 (the government "must demonstrate that the recited harms are real, not merely conjectural."). The County has not demonstrated how the practices of LSPRCs are causing the harm it has a compelling interest in addressing. The Fourth Circuit in *Greater Baltimore Center* demanded that the district court accord the government "the opportunity to develop

evidence relevant to the compelling government interest . . . including, inter alia, evidence substantiating the efficacy of the Ordinance in promoting public health." 721 F.3d at 288. The County has been given that opportunity. On the record before the court, the alleged harm caused by LSPRCs is based on the County's conjecture. Thus, the County has failed to satisfy strict scrutiny under the First Amendment and, by extension, Article 40 of the Maryland Declaration of Rights. Plaintiff's motion for summary judgment will be granted as to Counts I and III and the County will be permanently enjoined from enforcing the Resolution against Plaintiff.[10]

**IV. Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment will be denied. Plaintiff's motion for summary judgment will be granted in part. A separate order will follow.

_____
                          /s/
DEBORAH K. CHASANOW
United States District Judge

---

[10] Because Defendants have failed to demonstrate an actual problem in need of solving, it is unnecessary to reach the narrow tailoring prong of the strict scrutiny test. Similarly, it is unnecessary to consider Plaintiff's claims that the Resolution is unconstitutionally vague. Count II of the Amended Complaint, alleging violations of the Equal Protection Clause of the Fourteenth Amendment, is moot.

Furthermore, because Defendants have not satisfied their burden in opposing Plaintiff's motion, their own motion for summary judgment will necessarily be denied.